UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| GLASS, LEWIS & CO., LLC, )<br><br>Plaintiff, )<br><br>v. )<br><br>TODD ROKITA, *in his official capacity as* )<br>*Attorney General of Indiana*, )<br><br>Defendant. ) | Civil Action No. |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff Glass, Lewis & Co., LLC ("Glass Lewis") brings this Complaint for declaratory and injunctive relief against Todd Rokita, in his official capacity as Attorney General of Indiana, to challenge a newly enacted Indiana law, H.B. 1273 (the "Act") (attached as Ex. 1).

Glass Lewis respectfully requests a decision on its forthcoming motion for a preliminary injunction in advance of the Act's effective date of July 1, 2026.

## INTRODUCTION

1. H.B. 1273 is clearly unconstitutional. It violates the First Amendment's core prohibition on viewpoint discrimination. The Act targets proxy advisory firms like Glass Lewis, which institutional investors hire to provide research and recommendations on how to vote their shares at shareholder meetings. Under the Act, when Glass Lewis' speech disagrees with the views of company management, the Act compels Glass Lewis to provide government-mandated analysis or to publicly disparage itself. But when Glass Lewis' recommendations align with the views of company management, the Act does nothing. So, the Act imposes *significant burdens* for saying "management is wrong" and *no burdens* for saying "management is right." Thus, H.B. 1273 blatantly discriminates based on viewpoint in violation of the First Amendment.

2.  H.B. 1273 exists to do what the First Amendment strictly forbids: "tilt public debate in a preferred direction." *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 578 (2011). "At the heart of the First Amendment's Free Speech Clause is the recognition that viewpoint discrimination is uniquely harmful to a free and democratic society." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 187 (2024). "On the spectrum of dangers to free expression, there are few greater than allowing the government to change the speech of private actors in order to achieve its own conception of speech nirvana." *Moody v. NetChoice, LLC*, 603 U.S. 707, 741-42 (2024). A State "cannot advance some points of view by burdening the expression of others. To give government that power is to enable it to control the expression of ideas, promoting those it favors and suppressing those it does not. And that is what the First Amendment protects all of us from." *Id.* at 744 (citations omitted).

3.  The Act's legislative sponsors did not hide their viewpoint-discriminatory purpose: the two companies targeted are "ISS, which is kind of close to ISIS, and then Glass Lewis." The sponsor expressly and repeatedly acknowledged that H.B. 1273 only burdens anti-management views, and that it does so because of the sponsor's pro-management views. Comparing a proxy advisor to a terrorist group while saying company "management wants the best interest for both the company and the investors" obviously indicates that the opinion or perspective of the speaker is the rationale for the law's requirements. The Act's egregious and deliberate viewpoint discrimination is dispositive and fatal under the First Amendment.

4.  Even if the Court were to look beyond *viewpoint-based* discrimination—and it need not do so—the Act also violates the First Amendment because it engages in rank *content-based* discrimination and *compels speech* on matters of opinion.

5.      Worse, the Act is hopelessly and unconstitutionally vague, chilling Glass Lewis' speech by using ambiguous operative terms that leave Glass Lewis unable to determine what conduct is required.

6.      Finally, the Act violates the Dormant Commerce Clause by regulating commerce that takes place entirely outside Indiana's borders. *See Legato Vapors, LLC v. Cook*, 847 F.3d 825, 830 (7th Cir. 2017) ("[T]he application of a state statute to commerce that takes place[] wholly outside of the State's borders . . . . exceeds the inherent limits of the enacting State's authority and is invalid[.]") (quoting *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989)).

7.      If the Attorney General's enforcement of H.B. 1273 is not enjoined, it will cause serious and irreparable harm to Glass Lewis. It will also harm the institutional investors who depend on Glass Lewis' proxy advisory service to cast informed votes. By forcing Glass Lewis to attach misleading warnings to anti-management recommendations, the Act undermines the credibility and independence of advice that pension funds, university endowments, and other fiduciaries rely on. Glass Lewis' sophisticated clients have chosen to pay for Glass Lewis' services precisely because they value Glass Lewis' independent judgment. Indiana aims to imperil that framework by incentivizing Glass Lewis to agree with company management by forcing it to misleadingly disparage the quality of its own analysis or face severe fines if it does not.

8.      When disagreeing with management, if Glass Lewis does not comply with Indiana's idiosyncratic definition of "written financial analysis," it must broadcast misleading, self-denigrating, and government-scripted statements. Glass Lewis must give its clients and company management a "clear and conspicuous" warning that it failed to conduct a written financial analysis and suggest that it disregarded the effect the recommendation would have on

shareholders. H.B. 1273 § 11(a). And as punishment for disagreeing with management, Glass Lewis must post the same conspicuous warning on its website home page. *Id.* § 11(a)(3).

9.     Every court to consider a law of this type has found it unconstitutional. A federal court rejected Missouri's analogous attempt to impose warnings on investment advice as unconstitutional. *Sec. Indus. & Fin. Mkts. Ass'n v. Ashcroft*, 745 F. Supp. 3d 783, 800-01 (W.D. Mo. 2024). Last year, a federal court preliminarily enjoined the Texas Attorney General's enforcement of a similar statute, Texas' S.B. 2337, that contained similar pro-management viewpoint discrimination. *See* Text Order, *Glass, Lewis & Co., LLC v. Paxton*, No. 1:25-cv-1153 (W.D. Tex. Aug. 29, 2025).

10.     H.B. 1273 follows the same unconstitutional blueprint and the Court should enjoin its enforcement against Glass Lewis.

## PARTIES

11.     Plaintiff Glass, Lewis & Co., LLC is a Delaware limited liability company with its principal place of business in California. Glass Lewis supplies proxy voting advice and other forms of investment advice to institutional investors, including to clients in Indiana.

12.     Defendant Todd Rokita is the Attorney General of Indiana and is responsible for enforcing H.B. 1273. *See* H.B. 1273 § 12(b)-(c); Ind. Code §§ 24-5-0.5 *et seq*. He is sued in his official capacity. Defendant Rokita maintains an office at 302 West Washington Street, 5th Floor, Indianapolis, IN 46204.

## JURISDICTION AND VENUE

13.     This action arises under 42 U.S.C. §§ 1983 and 1988, 28 U.S.C. §§ 2201-02, and the U.S. Constitution. The Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a).

14. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (2) because the Attorney General resides in this District for purposes of official-capacity suits and a substantial part of the events giving rise to the claims occurred in this District.

## BACKGROUND

### I. Indiana H.B. 1273

15. Independent proxy advisors like Glass Lewis have become a focal point of a politically motivated campaign to suppress certain factors from being considered in investment and shareholder voting decisions. Attorney General Rokita has been a prominent figure in these efforts, suing investors who consider ESG and deriding it as "woke" and "left-leaning." President Trump has also singled out proxy advisory firms, issuing an executive order that targets them for supposedly advancing "politically-motivated agendas." Exec. Order No. 14,366, Protecting American Investors from Foreign-Owned and Politically-Motivated Proxy Advisors, 90 Fed. Reg. 58,503 (Dec. 11, 2025). The Act was crafted specifically to target Glass Lewis and another proxy advisory service, Institutional Shareholder Services Inc. ("ISS"). As the bill's sponsor put it, the two companies targeted are: "ISS, which is kind of close to ISIS, and then Glass Lewis."[1]

16. In 2025, Texas enacted a similar law specifically targeting anti-management proxy advisory speech, which was preliminarily enjoined before it took effect. *See* Text Order dated Aug. 29, 2025, *Glass, Lewis & Co., LLC v. Paxton*, No. 1:25-cv-1153 (W.D. Tex. Aug. 29, 2025); Tex. Bus. Org. Code §§ 6A.101(a)(2), (4), 102(a)(3). Several other states have moved to enact copycat legislation apparently modeled on a template distributed by an organization called "Consumers

---

[1] House Floor Action at 1:44:47-1:45:05 (Jan. 20, 2026), https://iga.in.gov/session/2026/video/house (select "Tuesday, Jan. 20" from "House Chamber" drop-down box).

Defense," whose stated "mission" is to "protect[] Americans from the scourge of ESG in all its forms, in every state, and in every arena where it infects."[2]

17.    Indiana's H.B. 1273 is a product of this coordinated campaign. The statute closely mirrors the Consumers Defense model legislation and imposes a punitive disclosure regime on any proxy advisor that recommends against a management-backed proposal. Noncompliance is treated as a deceptive trade practice, exposing Glass Lewis to enforcement actions and civil penalties for its speech expressing opinions disfavored by the government.

18.    At a high level, the way H.B. 1273 works is simple. If a proxy advisor's recommendation aligns with the views of company management, the Act does not cover the recommendation at all. But if the recommendation differs from company management's views, the proxy advisor must comply with burdensome and misleading disclosures.

19.    A diagram shows how the Act exclusively burdens anti-management views:

---

[2] Consumers Defense, https://perma.cc/7VBH-TL88; Proxy Advisor Transparency Act, Consumers Defense, https://perma.cc/A2S8-H7NH.



20.     Under this framework, a proxy advisor must make extensive disclosures if (and only if) it makes a recommendation against the views of company management. H.B. 1273 § 11. The Act provides no justification for this blatant viewpoint discrimination.

21.     The specific disclosures the Act requires depend on whether the proxy advisor's recommendation is "based on a written financial analysis"—a term the Act defines idiosyncratically. H.B. 1273 § 10. If the recommendation is not "based on" such an analysis,

Section 11(a) requires a series of self-disparaging disclosures. If it is, Section 11(b) requires the advisor to make different misleading disclosures and to hand over the analysis on request. Either way, Glass Lewis is compelled by the government to speak in a way that it otherwise would not.

22. The Act has a broad scope. It covers "proxy advisor[s]," defined as anyone who, for compensation, provides to interest holders of an "entity"—or to other persons with authority to vote on behalf of interest holders—any of the following forms of speech, defined as "proxy advisory service[s]":

> (1) Advice or a recommendation on how to vote on an entity proposal or proxy proposal;
>
> (2) Proxy statement research and analysis regarding an entity proposal or proxy proposal; or
>
> (3) Development of proxy voting recommendations or policies, including establishing default recommendations or policies.

H.B. 1273 §§ 7, 8. Glass Lewis provides these services, including to clients in Indiana.

23. The Act's definition of "entity" is sweeping. It includes any "business corporation," "general partnership," "limited liability partnership," "limited partnership," or "limited liability company"—including foreign entities organized under the laws of other states and countries. *Id.* § 2(a). The regulated speech—"proxy advisory service"—is defined to include services "provided in connection with an entity or are provided to any person in Indiana." *Id.* § 8(a). Although the statute is ambiguous and vague, the Act appears to cover advice about any entity anywhere—not just entities "in Indiana." *See* H.B. 1273 § 2(a) (defining "entity" to include a "business corporation," "general partnership," "limited liability partnership," "limited partnership," or "limited liability company" as defined in Indiana Code § 23-0.5-1.5); Ind. Code § 23-0.5-1.5-3 ("'Business corporation' means a domestic business corporation . . . or a foreign business corporation."). The bill's principal sponsor touted its extraterritorial reach, agreeing that "every

proxy adviser in America who advises a corporation, or a mutual fund, or a family office" "has to comply with this Indiana statute."[3]

24.    In sum, the Act purports to target worldwide speech, including advice by out-of-state proxy advisors to out-of-state clients about out-of-state companies.

25.    The law has two operative provisions, both of which are triggered only if a proxy advisor makes a recommendation that does not align with the views of company management:

> (1) Section 11(a) compels proxy advisors to make government-mandated, self-denigrating statements when their proxy advice goes against the views of company management and is not based on "written financial analysis";

> (2) Section 11(b) compels proxy advisors to make government-mandated disclosures when their proxy advice goes against the views of company management and produce their "written financial analysis" to management when the recommendation is based on "financial analysis."

26.    Section 11(a). Section 11(a) compels disclosures if the proxy advisor "makes a recommendation against entity management on an entity proposal or proxy proposal, or makes a default recommendation or policy concerning votes against entity management on entity proposals or proxy proposals," and the proxy advisor "does not do so based on a written financial analysis." H.B. 1273 § 11(a).

27.    However, the Act's bespoke definition of "written financial analysis" is overbroad and misleading. Under H.B. 1273, the term means a "written document" that: "(1) analyzes the expected short term and long term financial benefits and costs to an entity of implementing an entity proposal or proxy proposal; (2) concludes what vote or course of action is most likely to positively affect interest holder value; and (3) explains the methods and processes used to prepare

---

[3] House Floor Action at 1:44:35-1:45:56 (Jan. 20, 2026), https://iga.in.gov/session/2026/video/house (select "Tuesday, Jan. 20" from "House Chamber" drop-down box).

the analysis, including the experience and geographic location of the personnel who formed the conclusion." *Id.* § 10. This idiosyncratic definition is prescriptive, burdensome, and includes unrelated elements, such as the physical location of proxy advisor employees. From a practical perspective, it is at odds with the way proxy advisors—or, for that matter, company management and institutional investors—would define "financial analysis" or analyze management or shareholder proposals.

28.     Under Section 11(a), if a proxy advisor's anti-management recommendation is not based on a "written financial analysis" meeting this bespoke definition, the proxy advisor must provide the following self-denigrating statements to its clients and the subject company—and publish them prominently on its website homepage:

29.     *First*, the proxy advisor must "provide a clear and conspicuous disclosure to each interest holder or any person acting on behalf of an interest holder receiving the proxy advisory services" that "identifies the services being provided," "identifies the recommendation or policy at issue," and states that the proxy advisor has made the recommendation "without utilizing a written financial analysis" meeting the statutory definition set forth in Section 10. *Id.* § 11(a)(1).

30.     *Second*, if the proxy advisory services involve advice on "an entity proposal or proxy proposal" or related "proxy statement research and analysis," the proxy advisor must provide the same disclosure to company management. *Id.* § 11(a)(2).

31.     *Third*, the proxy advisor must "prominently display on the home page of the proxy advisor's website" a statement that it "has made a recommendation . . . against entity management on an entity proposal or proxy proposal" without "a written financial analysis." *Id.* § 11(a)(3). This website disclosure must contain the same content as the other disclosures and must remain on the

website "[f]or the entire time" the advisor "is providing proxy advisory services to an interest holder." *Id.*

32.    Section 11(b). Even if a proxy advisor makes a recommendation that *is* based on "written financial analysis," H.B. 1273 compels disclosures and dissemination. Section 11(b) requires the proxy advisor to: (1) provide a "clear and conspicuous disclosure" to each interest holder or person acting on their behalf, identifying the services and recommendation at issue and stating that the proxy advisor "utilized a written financial analysis" meeting the statute's definition, and that it is "available upon request," *id.* § 11(b)(1); (2) make that written financial analysis "available" to the recipient "within a reasonable time" after request, *id.* § 11(b)(2); and (3) if the services involve a management or shareholder proposal, "provide a copy of the written financial analysis" directly to entity management, *id.* § 11(b)(3).

33.    Section 12. Finally, Section 12 provides for enforcement.

34.    Section 12(b) states that a proxy advisor who violates any provision of the statute "commits a deceptive act which is actionable under IC 24-5-0.5 and subject to the penalties of IC 24-5-0.5"—Indiana's Deceptive Consumer Sales Act. H.B. 1273 § 12(b). Under that law, the Attorney General may seek injunctive relief and civil penalties of up to $5,000 per knowing violation. *See* Ind. Code § 24-5-0.5-4(c), (g).

35.    Section 12(c) allows for a suit for declaratory and injunctive relief by any "interested person." An "interested person" is defined to include: "(1) a recipient of proxy advisory services provided by a proxy advisor; (2) an entity that is the subject of proxy advisory services . . . provided by a proxy advisor; and (3) any interest holder" of any entity that is the subject of the proxy advisory services. *Id.* § 12(a). In addition, private plaintiffs must "provide written notice to

the attorney general" within seven days of filing suit, and the Attorney General has "the right to intervene" in any such action. *Id.* § 12(c).

## II.    Glass Lewis

### A.    Overview of Proxy Advisors and Glass Lewis

36.     Public companies are required to hold annual and special meetings to conduct business that requires shareholder approval. At these meetings, shareholders vote on various matters, including board elections, proposals submitted by the board or by shareholders, and any other decisions for which federal or state law, exchange listing standards, or a corporation's charter or bylaws require a shareholder vote.

37.     Matters requiring shareholder votes are compiled into the company's "proxy statement," which contains information about the matters to be considered at the meeting and is distributed to shareholders in advance. At the meeting, shareholders, or more typically their proxies—the specified designees who vote the shares owned by particular stockholders—will vote.

38.     The issues put to a shareholder vote range in complexity, including everything from ratifying the choice of an auditor, electing the board of directors, approving company plans to issue new shares (or rights to acquire new shares) as part of an executive and/or employee compensation program ("equity plans"), or approving proposed mergers and acquisitions.

39.     Proposals put forth by shareholders may cover a range of topics, including issues of corporate governance, executive compensation, as well as risks to the company stemming from environmental and social factors. Shareholder proposals are an important component of shareholder democracy. As the SEC has explained, shareholder proposals "provide an important mechanism for investors to express their views, provide feedback to companies, exercise oversight of management, and raise important issues for the consideration of their fellow shareholders."

SEC, Substantial Implementation, Duplication, and Resubmission of Shareholder Proposals Under Exchange Act Rule 14a-8, 87 Fed. Reg. 45,052, 45,053 (July 27, 2022).

40.    Company management (officers and the board of directors) often weigh in on shareholder proposals. *See* 17 C.F.R. § 240.14a-8(m)(1). The SEC describes this option as allowing management "to make arguments reflecting its own point of view, just as [shareholders] may express [their] own point of view." *Id.*

41.    There are many areas where management's interests may diverge from shareholders' interests, such as executive compensation, short-term performance vs. long-term growth, and management insulation from shareholder accountability. This idea—that management's interests may diverge from those of shareholders—is a fundamental and long-standing tenet of corporate law. *See* Michael C. Jensen & William H. Meckling, *Theory of the Firm: Managerial Behavior, Agency Costs and Ownership Structure*, 3 J. Fin. Econ. 305 (1976). For example, although shareholder proposals are almost always opposed by company management, academic research "has shown that these proposals have been 'key drivers' of governance changes such as the destaggering of board elections to increase corporate boards' accountability to shareholders."[4]

42.    Glass Lewis is a proxy advisory firm. It provides institutional investors with independent research, data analytics, and voting recommendations, so that those investors can discharge their fiduciary duty to cast informed votes on company ballot items. Through its proxy voting solutions and independent analysis, Glass Lewis aims to support the creation and preservation of long-term shareholder value.

---

[4] Colleen Honigsberg and Robert Jackson, *Exxon's Suit Against Its Own Shareholders Threatens Valuable Bargaining*, ProMarket, (July 16, 2024), https://perma.cc/FRE3-KHR5.

43.    Glass Lewis engages in First Amendment protected speech and expression when it provides advice and recommendations on how to vote on management and shareholder proposals, distributes proxy statement research, and develops proxy voting recommendations and policies. These services are at the core of Glass Lewis' business and constitute pure speech: written reports and policies that reflect Glass Lewis' views on how to best serve its clients and create and preserve long-term shareholder value.

44.    Glass Lewis' proxy vote recommendations are statements of opinion. For decades, the SEC has recognized the subjective nature of proxy advice and other speech on shareholder votes: "commentary concerning corporate performance, management capability or directorial qualifications or the desirability of a particular initiative subject to a shareholder vote is by its nature judgmental. As to such opinions, there typically is not a 'correct' viewpoint." SEC, Regulation of Communications Among Shareholders, 57 Fed. Reg. 48,276, 48,278 (Oct. 22, 1992). The SEC "recognize[s] that the formulation of proxy voting advice often requires subjective determinations and the exercise of professional judgment[.]" SEC, Proxy Voting Advice, 87 Fed. Reg. 43,168, 43,181 (July 19, 2022). Glass Lewis' reports contain the following disclaimer: "Glass Lewis' proxy vote recommendations are solely statements of opinion, and not statements of fact, on matters that are, by their nature, judgmental."

45.    Glass Lewis regularly advises that shareholders vote against the recommendation of company management when Glass Lewis believes doing so is in the best interests of shareholders. Votes against company management can help ensure accountability to shareholders.

46.    Votes for or against company management reflect Glass Lewis' opinions on the company and the proposals at issue. Glass Lewis may recommend against company management if it believes greater transparency is needed, shareholder interests are being discounted, or the

proposal would lead to fewer checks on management. In cases of poor financial performance or problematic governance practices, Glass Lewis may also take the position that board members should be changed or that the company's performance does not warrant a substantial increase in compensation. Again, these opinions reflect Glass Lewis' viewpoints about the company, its performance, and which corporate governance methods most effectively serve the interests of Glass Lewis' clients.

47.    Glass Lewis falls under the Act's definition of "proxy advisor." H.B. 1273 § 7. Its speech qualifies as "proxy advisory service[s]" as defined by H.B. 1273 § 8: Glass Lewis (1) provides advice and recommendations regarding how to vote on management and shareholder proposals; (2) gives proxy statement research and analysis regarding management and shareholder proposals; and (3) develops proxy voting recommendations or policies. *Id.*

48.    Glass Lewis' clients include some of the world's largest public pension plans, mutual funds, and asset managers. Glass Lewis exclusively serves highly sophisticated institutional investors. Glass Lewis does not serve retail investors.

49.    Glass Lewis serves at least eight clients with an Indiana mailing address.

50.    Glass Lewis is not aware of any Indiana clients who have requested that Glass Lewis provide what H.B. 1273 refers to as a "written financial analysis."

51.    Glass Lewis also provides reports and recommendations on Indiana companies, including Eli Lilly and Company, Elevance Health, Inc., and Cummins, Inc., among many others.

52.    Glass Lewis is independent of the companies about which it advises. It has no stake in the outcome of any shareholder vote, does not seek to control or influence any corporation, and does not engage in solicitation activities for or against any ballot measure. Glass Lewis' role is

solely to provide research and analysis that helps its clients form their own views on the proposals on which they are entitled to vote.

53.    Glass Lewis is organized in Delaware, and its principal place of business is in California. Glass Lewis has no offices in Indiana. Glass Lewis does not have employees in Indiana.

54.    Glass Lewis regularly provides advice and recommendations for Indiana clients and about Indiana companies that go against company management. To continue to serve its clients, Glass Lewis will be providing this same speech after the Act's effective date of July 1, 2026.

**B.    Glass Lewis' Proxy Papers**

55.    A core function of Glass Lewis' business is to provide proxy advice—reports with research and recommendations on how to vote on upcoming shareholder meetings and proposals ("Proxy Papers").

56.    Glass Lewis' Proxy Papers reflect the company's views and beliefs about what may be in the best interests of its clients based on established corporate governance best practices. They reflect the opinions of the company and its analysts. When Glass Lewis recommends a vote, it does so because Glass Lewis views that specific voting position as in the best interests of its clients.

57.    Glass Lewis is paid prior to the delivery of its Proxy Papers. It is not compensated based on whether it recommends for or against a proposal. Its Proxy Papers are designed to inform institutional investors and reflect Glass Lewis' views about the best interest of its clients; they are not used to advertise Glass Lewis' services.

58.    Glass Lewis' Proxy Papers contain detailed explanations of the facts relied upon, the policy provisions applied, and the reasoning behind the recommendations. The full Proxy Paper is shared with clients via Glass Lewis' research and voting platforms together with the corresponding voting recommendations, enabling clients to fully evaluate and question the recommendations as they see fit prior to making their final voting decisions.

59.    Glass Lewis' Proxy Paper on a company's annual meeting often consists of 50 or more pages of financial analysis, including dense tables of quantitative and qualitative information. Not only does Glass Lewis provide multi-year data on total shareholder returns relative to a company's index and peers, the section on the Advisory Vote on Executive Compensation alone for large companies often includes multiple tables of quantitative data and graphical representation of the company's executive compensation against its peer group, performance comparisons on earnings per share (EPS), return on equity (ROE), and returns on assets (ROA) against peers, and well over 100 financial data points. Further, each Proxy Paper provides company financial performance relative to peers across a multitude of financial measures of economic performance, including, but not limited to: gross profit margin, operating and net income margins, price/earnings ratios, total enterprise value to revenue and EBIT, and five-year revenue growth rate and earnings per share.

60.    As a matter of practice, Glass Lewis publishes its reports in the United States an average of 21 days prior to the company's annual meeting. This allows time for clients to consider Glass Lewis' recommendation, discuss it internally along with other information the client may consider, engage with the company, if necessary, and decide how to vote. Glass Lewis also allows companies to respond to its reports within this window. Glass Lewis may then issue a supplemental or amended report based on the company's feedback.

61.    Glass Lewis will only submit votes for a client if that client separately and expressly asks it to do so, pursuant to the client's chosen voting policy, for types of votes chosen by the client, and on timing specified by the client.

**C.    Benchmark, custom, and thematic voting policies**

62.    Glass Lewis' recommendations are tailored to each client's specific voting policy.

63.     Glass Lewis offers a Benchmark Policy that clients may choose, which reflects Glass Lewis' views as supported by two decades of Glass Lewis' research and analysis on how clients wish to create and preserve shareholder value. This includes recommendations against the view of company management when Glass Lewis believes it would not be in the best interests of shareholders.

64.     While Glass Lewis offers a Benchmark Policy, the significant majority of Glass Lewis' clients choose policies tailored to their specific investment preferences. Each Glass Lewis client has unique investment approaches, risk tolerances, views, and needs. For that reason, Glass Lewis offers its clients a menu of voting options. Indeed, Glass Lewis has announced that, by the end of 2027, it will move all clients off its Benchmark Policy and instead require them to receive recommendations under a custom or thematic policy chosen by that client. Glass Lewis also intends to offer multiple perspectives in its reports to better reflect the diverse views of its clients on proxy voting issues.

65.     Customization "empowers investors to express their unique ideologies and allocate their attention more efficiently, leading to potentially more informed voting that accurately reflects institutional investors' preferences."[5] The creation of a custom policy involves extensive discussions with and explicit confirmation upon implementation from the client.

66.     Custom policies allow Glass Lewis to focus its attention on issues that are important to investor clients to better inform clients about upcoming votes and ensure that the recommendations for those items are aligned with their guidelines. Custom voting policies are now a standard practice among institutional investors.

---

[5] Edwin Hu, et al., *Custom Proxy Voting Advice*, Harv. L. Sch. F. on Corp. Governance (May 23, 2024), available at https://perma.cc/QB3R-4RF5.

67.     Glass Lewis also offers thematic voting policies. For example, Glass Lewis has developed a Catholic Policy that reflects the unique fiduciary responsibility of Catholic institutions and that is informed by the voting guidelines of the Conference of Catholic Bishops. It has a Climate Policy for investors focused on mitigating risks associated with climate change. And it has a Corporate Governance Focused policy that provides recommendations that focus on the most commonly accepted components of corporate governance, while generally recommending in line with management on environmental and social issues.

68.     H.B. 1273's definition of "proxy advisory service" encompasses each of these policies, including Benchmark, custom, and thematic voting policies. The Act thus imposes an unnecessary and undue burden with respect to Glass Lewis' clients who have elected to receive recommendations under their own custom voting policy. Even when a sophisticated institutional investor has already developed its own policy, based on its investment philosophy, the needs of its clients, and whatever financial and other analysis it employed to arrive at its views, and explicitly instructed Glass Lewis to implement that policy, the Act forces Glass Lewis to either (1) make scripted disclosures and produce and share a separate "written financial analysis"; or (2) make different, self-disparaging disclosures required by Section 11(a).

69.     For example: a pension fund client may have a custom policy that directs Glass Lewis to vote against any board member who attended fewer than 75% of board meetings in the prior year. This policy reflects the client's own investment philosophy and fiduciary judgment that director attendance is a critical governance metric. When Glass Lewis implements that policy and recommends a vote against a director with poor attendance, the Act requires it to conduct a separate "written financial analysis" of the impact of voting against that director—analysis the client has already performed in developing its policy and already told Glass Lewis to implement. Worse,

Glass Lewis must then tell the client whether it thinks the client's policy is right, even though Glass Lewis deliberately leaves that qualitative judgment to its clients. If Glass Lewis does not comply, it must make misleading disclosures that suggest it makes recommendations with no analysis at all.

70.    Requiring Glass Lewis to independently analyze the financial merits of decisions that custom clients, who themselves typically have fiduciary duties to their end clients, have already made—and specifically directed Glass Lewis to implement—serves no proper purpose. It forces Glass Lewis to duplicate work the client has already done and wastes resources on analysis that custom clients did not request. Worse, it creates the perverse outcome of requiring Glass Lewis to tell its own client whether it agrees with the client's proxy voting policies. As part of the "written financial analysis," Glass Lewis must opine on whether the client's own chosen policy is likely to decrease shareholder value on a given vote—potentially exposing the client to breach of fiduciary duty claims and driving clients away from Glass Lewis' services altogether.

## III.    The Consequences of H.B. 1273

71.    H.B. 1273 will cause Glass Lewis irreparable harm. Whenever Glass Lewis disagrees with management, it must broadcast a misleading, state-mandated message. Where Glass Lewis' recommendation is not based on a "written financial analysis" as H.B. 1273 defines that term, Glass Lewis must include in its Proxy Papers a series of government-scripted statements that falsely characterize those Proxy Papers as deficient. The threat of $5,000-per-violation penalties compels Glass Lewis to choose between broadcasting a false government-mandated script and ruinous financial exposure.

72.    In effect, under Glass Lewis' current operating practice and given the vague way H.B. 1273 defines "written financial analysis," Glass Lewis will be required to make the self-denigrating government-scripted statements required under §11(a) virtually every time it issues a

recommendation against management. To avoid subjecting its employees to harassment or other risks, Glass Lewis does not publish the names of its analysts who work on particular recommendations. As a result, even reports backed by exhaustive financial assessments will not satisfy the statute's bespoke, idiosyncratic definition of "written financial analysis." *See* H.B. 1273 § 10.

73.     If Glass Lewis' recommendation is not "based on" H.B. 1273's version of a "written financial analysis"—whether because the recommendation is not susceptible to quantitative assessments or Glass Lewis simply does not identify the relevant analyst—the Act forces Glass Lewis to make self-disparaging statements to its clients, companies, and the general public. Glass Lewis must warp its advice by stating that it was made "without utilizing a written financial analysis regarding the impact that the recommended action would have on entity interest holders," including that Glass Lewis did not "analyze[] the expected short term and long term financial benefits and costs to the entity of implementing" the proposal; did not "conclude[] what vote or course of action is most likely to positively affect interest holder value"; and did not "explain[] the methods and processes used to prepare the analysis." H.B. 1273 § 11(a)(1)(C).

74.     The disclosures Section 11(a) compels are not merely burdensome—they are affirmatively false. Glass Lewis does consider the impact of its recommendations on shareholders, because Glass Lewis crafts each recommendation in accordance with the voting policy that the client has selected precisely to reflect the client's view of sound governance and shareholder value. Glass Lewis' Proxy Papers routinely run dozens of pages and contain detailed financial data—including historical performance metrics, peer comparisons, valuation analyses, and executive compensation benchmarks. To force Glass Lewis to state publicly that it has not considered the "impact" of its recommendation on shareholders, or that it has not explained its "methods and

processes," is to compel a falsehood. Many ballot items—such as director elections or nonbinding advisory votes on matters like reappointing the company's auditor—simply do not lend themselves to the kind of forward-looking financial predictions and quantitative computations that H.B. 1273 demands.

75.    Clients will be confused and misled by these disclosures. Clients may wrongly believe that Glass Lewis has conducted no analysis at all on these matters and that a vote the other way is backed by more financial analysis. As a result, clients may risk not voting or delaying their votes due to internal approvals, which would ultimately harm the company, the client, and Glass Lewis.

76.    Many Glass Lewis clients are asset managers to employee retirement plans governed by ERISA, which requires, among other things, that plan fiduciaries exercise shareholder rights, including voting proxies, "solely in accordance with the economic interest of the plan and its participants and beneficiaries." 29 C.F.R. § 2550.404a-1(d)(2)(ii)(A). If Glass Lewis were forced to falsely label its recommendations as lacking financial analysis, certain clients could feel compelled to disengage from Glass Lewis' services rather than risk being portrayed as violating their own fiduciary duties under ERISA.

77.    A website disclaimer that forces Glass Lewis to conspicuously suggest that its advice is deficient will deter clients from retaining Glass Lewis' services. Glass Lewis will suffer reputational harm by conspicuously disclosing on its website homepage that it made a recommendation "without utilizing a written financial analysis"—solely because it did not comply with Indiana's idiosyncratic and burdensome definition of that term. Potential and actual clients who see this disclaimer will be confused and be less likely to engage Glass Lewis' services because

- 22 -

the disclaimer falsely and misleadingly suggests Glass Lewis does not perform any "financial analysis" under the widely understood meaning of that term.

78. In addition, clients may question Glass Lewis' objectivity if H.B. 1273 takes effect. Clients hire Glass Lewis precisely because they can expect independent analysis, but H.B. 1273 incentivizes proxy advisors to simply agree with management and avoid the Act's onerous disclosure requirements. Indeed, the very purpose of the Act is to tilt proxy advisors' recommendations in favor of company management.

79. Further, Glass Lewis' Proxy Papers and specific recommendations to its clients are typically confidential. If Glass Lewis is required to disclose when and to whom it has recommended votes without financial analysis, it will necessarily have to violate the confidentiality of its reports and recommendations.

80. Setting aside the compelled-speech problems, compliance with H.B. 1273 is seemingly impossible because the statute's key terms are so vague that Glass Lewis cannot determine with confidence what is required. The resulting uncertainty itself causes harm, because any misstep exposes Glass Lewis to severe penalties.

81. The compliance costs alone would be devastating. Glass Lewis would need to build entirely new systems to generate, track, and distribute the disclosures H.B. 1273 requires, which is dramatically compounded by the fact that H.B. 1273 does not limit its reach to Indiana clients. These systems do not currently exist, and developing them would require significant capital expenditures and additional personnel.

82. Every instance of noncompliance carries the risk of an additional $5,000 penalty.

83. Without a preliminary and ultimately permanent injunction, Glass Lewis faces irreparable harm. *See Ind. Fine Wine & Spirits, LLC v. Cook*, 459 F. Supp. 3d 1157, 1170 (S.D.

Ind. 2020). As detailed above, the Act requires Glass Lewis to distort its speech and tilts the proxy-advice market in favor of management. Glass Lewis would also sustain reputational damage and incur substantial unrecoverable costs.

84.    Glass Lewis' preparations to comply with the Act have already imposed concrete economic harm on Glass Lewis. In undergoing these preparation efforts, and as a result of the Act, Glass Lewis was forced to divert time and resources away from its regular business.

## STANDING AND SOVEREIGN IMMUNITY

85.    Glass Lewis has standing to bring this challenge. Glass Lewis has "an injury that (1) is concrete and particularized, (2) was or will be caused by the defendant, and (3) will likely be remedied by a favorable judgment." *Brown v. Kemp*, 86 F.4th 745, 761 (7th Cir. 2023).

86.    ***First***, to demonstrate a concrete and particularized injury in a pre-enforcement challenge, a plaintiff must show "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by [the] statute." *Id.* (alteration in original) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)).

87.    Glass Lewis intends to—and will—engage in a course of conduct "affected with a constitutional interest." *See id.* Glass Lewis engages in First Amendment protected speech and expression when it provides advice and recommendations on how to vote on management and shareholder proposals, distributes proxy statement research and analysis on those proposals, and develops proxy voting recommendations and policies. These services consist of speech, are at the core of Glass Lewis' business, and are regulated by the Act. H.B. 1273 §§ 7, 8. Glass Lewis provides advice and recommendations that sometimes go against the views of company management and company boards. Thus, Glass Lewis intends to engage in a course of conduct protected by the First Amendment by providing proxy advisory services that will be regulated by H.B. 1273.

- 24 -

88. Glass Lewis also speaks through its internet website: https://www.glasslewis.com. On the website, Glass Lewis promotes itself and its services, and it conveys Glass Lewis' views on numerous matters of public concern.

89. The Act proscribes the course of conduct that Glass Lewis would engage in without the threat of enforcement by the Attorney General—(1) to provide advice and recommendations that do not align with the views of company management to clients in Indiana (and elsewhere) without including H.B. 1273's compelled speech; and (2) to express itself on its website without including the self-denigrating statement that it does not conduct such analysis. Absent H.B. 1273, Glass Lewis' speech would not include H.B. 1273's compelled speech or convey Indiana's views.

90. The threat of enforcement is substantial. Each violation of the Act by a proxy advisor constitutes a "deceptive act" that is actionable under Indiana's Deceptive Consumer Sales Act, Ind. Code § 24-5-0.5. Under that statute, if a court finds a knowing violation, the Attorney General may recover a civil penalty of up to $5,000 per violation. Ind. Code § 24-5-0.5-4(g). Any person who violates the terms of an injunction issued under the Act shall forfeit and pay to the state a civil penalty of up to $15,000 per violation. Ind. Code § 24-5-0.5-4(f). If each report to each client were to qualify as a separate violation, the threatened penalties from a single proxy season could easily reach millions of dollars.

91. ***Second***, the injury is traceable to Attorney General Rokita. H.B. 1273 tasks Defendant Attorney General Rokita with enforcing the Act. *See* H.B. 1273 § 12(b)-(c); Ind. Code § 24-5-0.5-4(c), (g).

92. ***Third***, the injury is redressable with an injunction against Attorney General Rokita and a declaration that the Act is unconstitutional as applied to Glass Lewis. A declaration and injunction would remove the threat of civil suits brought by the Attorney General. *Krislov v.*

*Rednour*, 226 F.3d 851, 858 (7th Cir. 2000) ("Because the district court has the ability to enjoin the enforcement of the statute, the harm is sufficiently redressable in this suit.").

93.    For similar reasons, Glass Lewis satisfies the *Ex parte Young* exception to sovereign immunity. *See Ex parte Young*, 209 U.S. 123 (1908). "[W]here a plaintiff sues a state official to enjoin the enforcement of a state statute, the requirements of *Ex parte Young* overlap significantly with the last two standing requirements—causation and redressability." *Doe v. Holcomb*, 883 F.3d 971, 975 (7th Cir. 2018).

94.    "The *Ex parte Young* doctrine allows private parties to sue individual state officials for prospective relief to enjoin ongoing violations of federal law." *Council 31 of AFSCME v. Quinn*, 680 F.3d 875, 882 (7th Cir. 2012) (quotation marks omitted). "A court applying the *Ex parte Young* doctrine now need only conduct a straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Ind. Prot. & Advocacy Servs. v. Ind. Family & Soc. Servs. Admin.*, 603 F.3d 365, 371 (7th Cir. 2010) (quotation marks omitted). Here, Glass Lewis sues only for prospective relief, and the harms of H.B. 1273 are both ongoing and imminent.

95.    H.B. 1273 specifically tasks Defendant Attorney General Rokita with enforcing the Act. *See* H.B. 1273 § 12(b)-(c); Ind. Code § 24-5-0.5-4(c), (g). Where the "Attorney General . . . has the power to enforce the" law at issue, the "some connection" element is satisfied. *Entm't Software Ass'n v. Blagojevich*, 469 F.3d 641, 645 (7th Cir. 2006).

96.    Upon information and belief, Attorney General Rokita intends to enforce H.B. 1273 against Glass Lewis. The statute was crafted to specifically target Glass Lewis and another proxy

advisory service, ISS. As the bill's sponsor put it, the two companies targeted are: "ISS, which is kind of close to ISIS, and then Glass Lewis."[6]

97.     Attorney General Rokita has a well-documented track record of targeting proxy advisors. In 2022, he issued an Advisory Opinion declaring that Indiana law prohibits state pension fund managers and their advisors from considering ESG factors when evaluating proxy votes.[7] The next year, he joined a coalition of Attorneys General in sending a demand letter directly to Glass Lewis and ISS, accusing them of violating state consumer protection laws based on the content of their proxy advice—specifically, advice that those officials viewed as "contrary to the financial interests" of shareholders, including advice that takes environmental, social, and governance ("ESG") considerations into account.[8] And in 2024, he and three other state attorneys general filed suit against three investment management firms for their ESG practices, which he touted as "taking further action to stop woke corporatists and their left-leaning allies in government."[9]

98.     H.B. 1273 is the next step in Attorney General Rokita's campaign against proxy advisors. The Act labels the failure to comply with H.B. 1273's requirements "a deceptive act" that "is actionable" by the Indiana Attorney General under Indiana's consumer protection law, and it allows the Indiana Attorney General to intervene in suits brought by private parties. H.B. 1273 § 12(b)-(c); *see* Ind. Code § 24-5-0.5-4(c), (g).

---

[6] House Floor Action at 1:44:47-1:45:05 (Jan. 20, 2026), https://iga.in.gov/session/2026/video/house (select "Tuesday, Jan. 20" from "House Chamber" drop-down box).

[7] Indiana OAG, Press Release, Attorney General Todd Rokita Moves to Protect Indiana State Employees' Retirement Funds from Being Leveraged for Corporate Woke Causes (Sep. 1, 2022), https://perma.cc/C36A-92TQ.

[8] Letter from State Attorneys General to ISS and Glass Lewis (Jan. 17, 2023), https://perma.cc/434X-VZV5.

[9] Daniel Carson, Indiana Joins Lawsuit Targeting ESG Practices of Major Investment Firms, The Indiana Lawyer (Dec. 5, 2024), https://perma.cc/86PC-QSVM.

99.    *Ex parte Young* is satisfied because Attorney General Rokita has the statutory authority to enforce H.B. 1273 and has shown a clear willingness to enforce such laws.

## CLAIMS

100.    Glass Lewis raises a challenge to H.B. 1273 as applied to Glass Lewis.

## COUNT I

### 42 U.S.C. § 1983
### VIOLATION OF THE FIRST AMENDMENT, AS INCORPORATED AGAINST THE STATES THROUGH THE FOURTEENTH AMENDMENT (FREEDOM OF SPEECH)

101.    Glass Lewis incorporates all prior paragraphs as though fully set forth herein.

102.    The First Amendment to the U.S. Constitution provides that the government "shall make no law . . . abridging the freedom of speech, or of the press." U.S. Const. amend. I. When the Government regulates speech, it "bears the burden of proving the constitutionality of its actions." *FEC v. Cruz*, 596 U.S. 289, 305 (2022) (citation omitted).

103.    The First Amendment "protect[s] the freedom to think as you will and to speak as you think." *303 Creative LLC v. Elenis*, 600 U.S. 570, 584 (2023) (citation and quotation marks omitted). "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995).

104.    The Act engages in viewpoint-based discrimination. Without the need for any strict scrutiny analysis, the "Court's finding of viewpoint bias" effectively "end[s] the matter." *Iancu v. Brunetti*, 588 U.S. 388, 399 (2019). The Act also engages in content-based discrimination and fails strict scrutiny. Although the Act does not regulate commercial speech, it fails even under the commercial speech intermediate scrutiny standard.

105.    **Viewpoint and content discrimination.** There are "two distinct but related limitations that the First Amendment places on government regulation of speech." *Reed v. Town*

*of Gilbert, Ariz.*, 576 U.S. 155, 168 (2015). First, content-based discrimination targets *topics*; it exists when a law "applies to particular speech because of the topic discussed or the idea or message expressed." *Id.* at 163. Second, a "viewpoint-based regulation targets not merely a subject matter, but particular *views* taken by speakers on a subject." *Vidal v. Elster*, 602 U.S. 286, 293 (2024) (emphasis added) (quotation marks omitted). "Government discrimination among viewpoints . . . is a more blatant and egregious form of content discrimination." *Reed*, 576 U.S. at 168 (quotation marks omitted).

106.    "Modern First Amendment cases establish a *per se* rule making the punishment of speech flatly unconstitutional if the penalty is based on . . . the undesirability of the viewpoint expressed. . . . While the First Amendment as a whole is not an absolute, the prohibition against viewpoint discrimination is a 'pocket of absolutism' in which the Supreme Court has tolerated no abridgments." 1 Rodney A. Smolla, *Smolla & Nimmer on Freedom of Speech* § 4:8 (Apr. 2026).

107.    Recent Supreme Court opinions support this conclusion. "[R]estrictions . . . based on viewpoint are prohibited." *Minn. Voters All. v. Mansky*, 585 U.S. 1, 11 (2018). "[I]t is all but dispositive to conclude that a law is . . . viewpoint discriminatory." *Sorrell*, 564 U.S. at 571. "The Court's finding of viewpoint bias ended the matter." *Iancu*, 588 U.S. at 399. "The government may not discriminate against speech based on the ideas or opinions it conveys." *Id.* at 393. A state "cannot advance some points of view by burdening the expression of others." *Moody*, 603 U.S. at 744. Just a flat prohibition—no balancing or tiers of scrutiny required.

108.    Viewpoint discrimination always requires at least strict scrutiny—even for commercial speech or categorically unprotected speech. "The First Amendment requires heightened scrutiny *whenever* the government creates a regulation of speech because of disagreement with the message it conveys. . . . Commercial speech is no exception." *Sorrell*, 564

U.S. at 566 (emphasis added); *see also Matal v. Tam*, 582 U.S. 218, 251 (2017) (Kennedy, J., concurring) (same); *accord Vidal*, 602 U.S. at 293. For example, "a State may choose to regulate price advertising in one industry . . . because the risk of fraud . . . is in its view greater there. But a State may not prohibit only that commercial advertising that depicts men in a demeaning fashion." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 388-89 (1992) (citations omitted). So, too, for unprotected speech: "the government may proscribe libel; but it may not make the further content discrimination of proscribing *only* libel critical of the government." *Id.* at 384, 388-89.

109.   Here, H.B. 1273 is a textbook viewpoint- and content-based restriction on speech. The Act's disclosure obligations are activated only when a proxy advisor "makes a recommendation against entity management." H.B. 1273 § 11 (emphasis added). A proxy advisor that endorses management's position bears no burden at all. The Act thus "imposes financial burdens on certain speakers based on the content of their expression"—and because it also selectively penalizes a "particular view[]," the constitutional violation "is all the more blatant." *Rosenberger*, 515 U.S. at 828-29. The First Amendment protects dissent above all else: it "secures, even and especially, the right to voice dissenting views." *Chiles v. Salazar*, 146 S. Ct. 1010, 1024 (Mar. 31, 2026).

110.   The Act's speaker-based discrimination reinforces the viewpoint discrimination. H.B. 1273 regulates only one narrow class of speakers—proxy advisors who provide advice "for compensation"—while exempting every other participant in the proxy voting process. *See Sorrell*, 564 U.S. at 567 (law impermissibly "aimed at particular speakers"). Company management, institutional shareholders, financial institutions, and anyone else offering advice without charge may all recommend that shareholders vote against management without triggering any of H.B.

1273's requirements. This asymmetry underscores that H.B. 1273 was designed not to protect investors, but to silence a particular class of speakers whose views the State disfavors.

111.    H.B. 1273's discriminatory purpose is evident from its origins. The statute was modeled on legislation promoted by an advocacy organization whose stated mission is to eradicate "the scourge of ESG in all its forms." And the animus extends to the State's highest levels: Indiana has made no secret of its disagreement with proxy advice that considers environmental, social, or governance factors.

112.    The bill's legislative sponsor expressly acknowledged that the bill imposes asymmetric burdens on anti-management views: "You have to show your work. You have to show we are making this suggestion based off X, Y, and Z. And so, and now if you're in agreement with management, you don't even have to do that. It's just if you're disagreeing with management."[10] The sponsor did not conceal that the discrimination against anti-management views stemmed from his pro-management views: "we work off the assumption that the company's management wants the best interest for both the company and the investors."[11] He explained: "In the bill, if the proxy advisor agrees with management, there is no responsibility on the proxy advisor. . . . And so if the proxy advisor is agreeing with them, we're putting on a less regulatory burden for them to show their homework. Theoretically, yes, we could make it where they have to show their homework either way. . . . If the company is asking for a yes vote on whatever item, and there is an implied belief that they are doing that for the best interests of their company — which is the best interest

---

[10] House Floor Action at 1:48:05-1:48:18 (Jan. 20, 2026), https://iga.in.gov/session/2026/video/house (select "Tuesday, Jan. 20" from "House Chamber" drop-down box).

[11] House Financial Institutions Committee Debate at 2:03:28-2:03:34 (Jan. 13, 2026), https://iga.in.gov/session/2026/video/house (select "Tuesday, Jan. 13" from "House – Financial Institutions" drop-down box).

of their investors. Therefore, we're making it a little bit easier for them to say, hey, there is an assumption that that company is trying to do best for its investors."[12]

113. Indiana may prefer deference to management on proxy voting questions, but the Constitution does not permit a State to "burden the speech of others in order to tilt public debate in a preferred direction." *Sorrell*, 564 U.S. at 578-79; *see Reed*, 576 U.S. at 164 (laws adopted "because of disagreement with the message the speech conveys" are presumptively unconstitutional). A "State cannot advance some points of view by burdening the expression of others." *Moody*, 603 U.S. at 744.

114. The Act's under-inclusivity is another hallmark of viewpoint and content discrimination. Here, the statute purports to target advice made without written financial analysis but entirely omits advice that *agrees* with company management, even if such advice lacks any analysis whatsoever. The result is that under this statute, a recommendation to support management backed by nothing more than a blank page is perfectly lawful, while a recommendation to oppose management backed by dozens of pages of rigorous, quantitative analysis is deemed "deceptive" for the sole reason that it does not identify analysts by name.

115. Such "[u]nderinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 802 (2011). Indeed, the under-inclusivity confirms the Act's true purpose: to punish proxy advisors when they disagree with management.

116. Moreover, viewpoint discrimination "is inherent in the design and structure of this Act." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 779 (2018) ("*NIFLA*")

---

[12] Senate Insurance and Financial Institutions Debate at 49:53-50:58 (Feb. 11, 2026), https://iga.in.gov/session/2026/video/house (select "Wednesday, Feb. 11" from "Senate Chamber" drop-down box).

(Kennedy, J., concurring). "[T]he history of the Act's passage and its underinclusive application suggest a real possibility that" proxy advisors' speech was targeted because the State disagrees with the positions they have taken. *Id.* at 779-80. The purpose of the Act is to punish viewpoints that differ from company management. A "State may not interfere with private actors' speech to advance its own vision of ideological balance." *Moody*, 603 U.S. at 741. "On the spectrum of dangers to free expression, there are few greater than allowing the government to change the speech of private actors in order to achieve its own conception of speech nirvana." *Id.* at 741-42.

117.    **Compelled Speech.** H.B. 1273 does not merely disfavor Glass Lewis' anti-management speech—it forces Glass Lewis to recite the State's preferred message as a condition of speaking at all. Whenever Glass Lewis recommends against management, the Act requires Glass Lewis to issue a scripted series of statements that mischaracterize Glass Lewis' business, denigrate the quality of its analysis, and compromise its client relationships. The First Amendment categorically prohibits such compulsion: "[i]n this Nation, no official . . . may command our tongues." *Chiles*, 146 S. Ct. at 1021.

118.    The exact content of the forced statements depends on whether the advisor made its recommendation "based on a written financial analysis" meeting Indiana's idiosyncratic statutory definition. *See* H.B. 1273 §§ 11(a)-(b). But regardless of whether Glass Lewis makes a "written financial analysis," the Act compels Glass Lewis' speech.

119.    *The "written financial analysis" path*. Start with the written financial analysis. This "analysis" must include "the expected short term and long term financial benefits and costs" to the company of "implementing" the proposal and offer a "conclu[sion]" as to "what vote or course of action is most likely to positively affect interest holder value." *Id.* § 10. But, as noted above, many

proxy ballot issues do not lend themselves to that kind of financial quantification, so the Act compels Glass Lewis to make a quantitative analysis on a matter of qualitative judgment.

120.    It is unclear how anyone could purport to predictably quantify the "expected short term and long term financial benefits and costs" of a vote for one director on the company board over another, a vote to ratify or reject a particular auditor, or a vote for or against a nonbinding shareholder proposal that the company can ignore even if it passes. Perhaps that is why no rule requires company issuers, shareholder proponents, or solicitors of proxy votes to quantify the "financial benefits and costs" of proxy voting proposals, even though all those entities would be better situated than Glass Lewis to try to do so.

121.    If Glass Lewis did attempt to produce H.B. 1273's "written financial analysis," it would also be required to "conclude[] what vote or course of action is most likely to positively affect interest holder value." H.B. 1273 §§ 10, 11(b). But there is no obvious way to assign a dollar figure to a vote for one director over another, a vote to ratify or reject a particular auditor, or a vote for or against a nonbinding shareholder proposal. Indeed, "empirical research suggests that it is almost impossible to demonstrate a convincing link between any voting decision and economic value, especially decisions like reincorporating in Texas, eliminating a staggered board or restructuring a compensation package."[13] The problem runs deeper than difficulty of measurement. Glass Lewis routinely provides different recommendations to different clients on the same vote, depending on each client's chosen voting policy: some clients subscribe to an "ESG skeptical" policy, others to a Climate Policy, and still others to a Catholic Policy reflecting faith-based governance principles. What "positively affect[s] interest holder value" for one client may be the

---

[13] Jill E. Fisch, *Remarks Before the Investor Advisory Committee of the U.S. Securities and Exchange Commission*, Harv. L. Sch. F. on Corp. Governance (July 1, 2025), https://perma.cc/7SS7-EBFH.

opposite for another, and the Act would force Glass Lewis to issue a single pronouncement on shareholder value to clients with diametrically opposed philosophies—forcing Glass Lewis to choose sides among its own clients.

122.   That is something Glass Lewis does not do and should not be compelled to do. By its very nature, the Act's "written financial analysis" requirement compels Glass Lewis to take sides on contested questions of optimal investment strategy. As Glass Lewis announced in November 2025, "recommendations [should] reflect the varying viewpoints of our institutional clients."[14] Investors should "exercise their shareowner rights in the manner they choose, ensuring that their policy—not ours—drives voting outcomes."[15] Yet, H.B. 1273's written financial analysis requirement does the opposite. It forces Glass Lewis to adopt a single view on whether a recommendation is likely to increase shareholder value—in direct contradiction to Glass Lewis' core belief that this subjective judgment should be left to its clients.

123.   And if Glass Lewis does conduct a written financial analysis, the Act further compels its speech by requiring it to give company management that analysis—for free.

124.   *The no "written financial analysis" path*. The compelled disclosures are even more offensive if Glass Lewis does not conduct a written financial analysis. All the statements in Section 11(a) are misleading and self-denigrating. Glass Lewis does consider "the impact that the recommended action would have on entity interest holders" because Glass Lewis makes its recommendations based on its clients' chosen criteria. In addition, Glass Lewis' detailed reports and analyses thoroughly explain "the methods and processes" Glass Lewis used in reaching its conclusions. H.B. 1273 would force Glass Lewis to falsely say the opposite. And forcing Glass

---

[14] Bob Mann (Glass Lewis Chief Executive Officer), *A Personal Commitment to Change Proxy Voting Practices*, Glass Lewis (Nov. 25, 2025), https://perma.cc/AK79-E5SG.

[15] *Id.*

Lewis to say that its advice did not analyze "short term and long term financial benefits" or "conclude[]" which vote "is most likely to positively affect interest holder value" falsely suggests both that such an analysis is possible and that Glass Lewis' analyses and advice are neither rigorous nor motivated by Glass Lewis' clients' focus on financial return.

125.    H.B. 1273 forces Glass Lewis to trumpet false and misleading statements to the world in perpetuity, requiring Glass Lewis to "prominently display" them on "the home page" of Glass Lewis' website. *Id*. § 11(a)(3). H.B. 1273 also requires Glass Lewis to deliver these self-denigrating statements directly to the companies that are the subjects of Glass Lewis' advice, "identif[ying] the services" and "identif[ying] the recommendation or policy" that Glass Lewis provided to each of its clients. *Id.* § 11(a)(1)-(2).

126.    Under Section 11(a) or Section 11(b), the Act compels Glass Lewis "to create speech on weighty issues with which [Glass Lewis] disagrees" and disseminate it to audiences Glass Lewis has not selected. *303 Creative*, 600 U.S. at 599. "By compelling [Glass Lewis] to speak a particular message," such disclosures "alter[] the content of [Glass Lewis'] speech." *NIFLA*, 585 U.S. at 766.

127.    **Strict scrutiny.** Without the need for any strict scrutiny analysis, the "Court's finding of viewpoint bias" effectively "end[s] the matter." *Iancu*, 588 U.S. at 399. "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger*, 515 U.S. at 828. And compelled speech is inherently antithetical to the First Amendment—so much so that courts frequently strike down compelled-speech regimes without bothering to ask whether they could survive strict scrutiny. *See, e.g.*, *303 Creative*, 600 U.S. at 603. But at a minimum, strict scrutiny applies, and H.B. 1273 cannot satisfy it. The State has no compelling interest—indeed, no legitimate interest—in forcing Glass Lewis to issue

misleading disclosures to its clients and the public, or in requiring Glass Lewis to expose confidential client information to corporate issuers around the world. And the Act is not tailored to any conceivable state interest: a statute that sweeps in every anti-management recommendation about every company in the world is the antithesis of narrow tailoring.

128. **<u>The Act does not regulate commercial speech.</u>** Commercial speech doctrines are inapplicable to laws that discriminate against viewpoints. *Sorrell*, 564 U.S. at 566. Even setting that aside, the Act does not regulate commercial speech, so no lower standard of scrutiny applies.

129. The "core notion" of commercial speech is "speech which does no more than propose a commercial transaction." *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66 (1983) (citation and quotation marks omitted). The fact that speech "has an economic motivation" is "insufficient by itself" to turn it into commercial speech. *Id.* at 67. The Supreme Court has defined commercial speech as expression that does "no more than propose a commercial transaction." *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 762 (1976).

130. Glass Lewis' proxy advice is not commercial speech. Its proxy advisory services are analogous to the editorial opinions of a newspaper or the endorsement of a political candidate: they offer judgment and analysis, not products. Glass Lewis' speech does not "propose a commercial transaction"—the "core notion" of commercial speech. The fact that Glass Lewis provides speech for compensation is "insufficient by itself" to transform it into commercial speech. *See Bolger*, 463 U.S. at 66-67; *Sorrell*, 564 U.S. at 567. Glass Lewis' reports reflect its opinions and interpretations of information about matters of public concern. And as the D.C. Circuit has confirmed, proxy-voting advice is "simply a recommendation." *Institutional Shareholder Servs. Inc. v. SEC*, 142 F.4th 757, 768 (D.C. Cir. 2025).

131.    Glass Lewis' Proxy Papers relate to matters of significant public concern, and while they might be provided to financial institutions, they fall squarely within the realm of pure speech. The reports address contested questions of corporate governance, executive accountability, and shareholder rights that lie at the intersection of finance and public policy. For example, recent Glass Lewis reports include a recommendation for Warner Bros. shareholders to vote with management for Paramount's acquisition,[16] and for BP shareholders to vote against management on a proposal to change course and stop making certain climate disclosures.[17] Both votes implicate matters of significant public concern related to live, ongoing political debates.

132.    But H.B. 1273 could not survive even the intermediate scrutiny applicable to purely commercial speech. Under *Central Hudson*, a restriction on otherwise protected commercial speech is valid only if the government demonstrates that its regulation "directly advances" a "substantial" governmental interest and is "not more extensive than is necessary to serve that interest." *Pearson v. Edgar*, 153 F.3d 397, 401 (7th Cir. 1998) (quoting *Central Hudson Gas & Electric Corp. v. Public Service Comm'n of New York*, 447 U.S. 557, 566 (1980)). The government's burden on this point is significant: it "is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Edenfield v. Fane*, 507 U.S. 761, 770-71 (1993); *see Pearson*, 153 F.3d at 401. Moreover, in the Seventh Circuit, "[w]hen First Amendment interests are at stake, the least

---

[16] *Proxy adviser Glass Lewis recommends Warner Bros shareholders vote for Paramount deal*, Reuters (Apr. 10, 2026), https://www.reuters.com/legal/transactional/proxy-adviser-glass-lewis-recommends-warner-bros-shareholders-vote-paramount-2026-04-10.

[17] Shadia Nasralla & Stephanie Kelly, *BP Shareholders Reject Two Board Proposals as Chair Gets Lower-Than-Typical Support*, Reuters (Apr. 23, 2026), https://www.reuters.com/legal/transactional/bp-fails-get-shareholder-majority-approval-two-agm-resolutions-2026-04-23.

restrictive means of effectuating government interests must be employed." *Perry v. Local Lodge 2569 of Int'l Ass'n of Machinists & Aerospace Workers*, 708 F.2d 1258, 1262 (7th Cir. 1983).

133.   H.B. 1273 fails at every step. Indiana has not demonstrated any substantial interest that would justify the statute's sweeping restrictions on proxy advisory speech—much less provided evidence that those harms are "real" rather than speculative. The government cannot rely on "mere speculation and conjecture" to justify a commercial speech regulation, and must instead identify an "'actual problem' in need of solving." *Richwine v. Matuszak*, 707 F. Supp. 3d 782, 804-05 (N.D. Ind. 2023), *aff'd*, 148 F.4th 942 (7th Cir. 2025). Indiana can make no such showing. The bill's sponsor repeatedly emphasized that H.B. 1273 was designed not to protect Indiana shareholders because of any past instances of deception. Instead, he volunteered that the proposed proxy regulation is merely part of "a broader conversation across the country" and "I can't speak to a specific company in Indiana or specific issue, you know, vote that happened."[18]

134.   The statute does not directly advance any legitimate governmental interest; to the contrary, it distorts the free flow of information to sophisticated institutional investors by compelling proxy advisors to produce state-mandated "written financial analyses" or else affix misleading disclaimers to their recommendations and national website.

135.   H.B. 1273 is vastly more extensive than necessary: rather than addressing any actual, identified harm, it imposes onerous disclosure and compelled-speech obligations that burden far more speech than could conceivably be justified, including requiring proxy advisors to share confidential work product with corporate management—a requirement that bears no reasonable relationship to any asserted consumer-protection interest. "This approach furthers the

---

[18]   House Financial Institutions Committee Debate at 2:00:20-2:01:30 (Jan. 13, 2026), https://iga.in.gov/session/2026/video/house (select "Tuesday, Jan. 13" from "House – Financial Institutions" drop-down box).

state's interests the way an atom bomb would further the eradication of a residential ant infestation. It goes much too far." *Richwine v. Matuszak*, 148 F.4th 942, 955 (7th Cir. 2025). And the Legislature's failure to consider other, less burdensome alternatives is fatal. *See NIFLA*, 585 U.S. at 775; *Free Speech Coal., Inc. v. Paxton*, 95 F.4th 263, 284 (5th Cir. 2024), *aff'd*, 606 U.S. 461 (2025); *see Sec. Indus. & Fin. Mkts. Ass'n*, 745 F. Supp. 3d at 800.

136.    Because H.B. 1273's unconstitutional content- and viewpoint-based triggering provisions and compelled speech requirements are integral to the entire law, the entire law must be invalidated and enjoined as to Glass Lewis. Unless invalidated and enjoined as to Glass Lewis, H.B. 1273 will deprive Glass Lewis of its First Amendment rights and cause it to suffer irreparable injuries.

## COUNT II

### 42 U.S.C. § 1983
### VOID FOR VAGUENESS UNDER THE FIRST AND FOURTEENTH AMENDMENTS

137.    Glass Lewis incorporates all prior paragraphs as though fully set forth herein.

138.    The Due Process Clause demands that a statute give regulated parties fair notice of what it requires and constrain enforcement discretion so that the Act is not applied in an arbitrary or discriminatory manner. *See FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253-54 (2012). These requirements apply with special force where, as here, the Act regulates speech—because vague speech regulations inevitably chill constitutionally protected expression. *Id.*

139.    H.B. 1273 flunks both prongs of the vagueness inquiry as applied to Glass Lewis. The statute is vague both in the conditions that trigger its disclosure requirements and in the substance of what those requirements demand.

140.    The Act's triggering conditions are hopelessly ambiguous. Section 11 applies whenever a proxy advisor "makes a recommendation against entity management" or "makes a

default recommendation or policy concerning votes against entity management." H.B. 1273 § 11(a), (b). But the statute defines "default recommendation or policy" in sweeping and opaque terms that encompass everything from "system[s]" to "guidelines," *id.* § 1, leaving Glass Lewis unable to determine which of its products and services fall within the Act's reach. Adding to the confusion, Section 11 also references "proxy advisory services," *id.* § 11(a)(1), (b)(1), which the statute defines even more broadly than "recommendations" or "default recommendations or policies," *id.* § 8—further blurring the line between covered and uncovered conduct.

141.   The Act also suffers from poor drafting that renders the Act vague. The Act defines "proxy advisory service" as "services that are provided in connection with an entity or are provided to any person in Indiana." H.B. 1273 § 8(a). It is unclear whether "in Indiana" modifies "person" only, or also modifies "entity." The consequences of this ambiguity are enormous: if "in Indiana" only modifies "person," then the Act covers proxy advice to all entities nationwide. If Glass Lewis interprets the statute and guesses wrong, H.B. 1273 imposes ruinous liability of $5,000 per violation.

142.   Likewise, H.B. 1273 requires disclosure of written financial analysis to "each interest holder or any person acting on behalf of an interest holder receiving the proxy advisory services." *Id.* § 11(a)(1). But it is unclear if the phrase "receiving the proxy advisory services" modifies "each interest holder." In other words, does Glass Lewis need to provide its analysis to all shareholders, or only those shareholders who directly receive its advice? Again, poor drafting creates an unresolvable ambiguity with drastic liability for the wrong interpretation.

143.   As another example of the Act's bad drafting, the Act's key enforcement and disclosure provisions contain internal cross-references to subdivisions that do not exist. Specifically, actions mandated by Sections 11 and 12 of the Act are each triggered by the conduct

described in "section 8(1)" and "section 8(2)" of the chapter. *Id.* §§ 11(a)(2)-12(a)(3). But Section 8(1) and Section 8(2) do not exist. The references to nonexistent provisions are emblematic of an even graver defect: a statute that threatens devastating liability through nebulous requirements that failed to receive a careful review before enactment.

144.    As another example, it is unclear what a proxy advisor must do if it tries to produce a "written financial analysis" but the issue does not lend itself to the kind of forward-looking quantification demanded by H.B. 1273's definition of "written financial analysis": Would the Act permit Glass Lewis to say that any "short term and long term" benefits and costs are unclear, to discuss them in general or qualitative terms, or to say that Glass Lewis cannot "conclude[]" which vote is "most likely to positively affect interest holder value"? Or must Glass Lewis state that it made the recommendation without conducting this so-called "written financial analysis"?

145.    If the required disclosures are triggered, H.B. 1273 leaves substantial uncertainty about how Glass Lewis should comply. For instance, the Act does not explain what counts as a "clear and conspicuous disclosure." *Id.* § 11(a)(1). The Act also does not explain how or how quickly Glass Lewis must provide the required disclosure to entity management or how "prominent[]" the website disclosure must be. *Id.* § 11(a)(2), (a)(3). Nor does the Act detail how promptly Glass Lewis must respond to a request for a "written financial analysis," nor explain how long this production requirement as to any particular recommendation persists. *Id.* § 11(b)(1).

146.    The result is a statute that arms the Attorney General with standardless discretion. Because the Act provides Glass Lewis no reliable way to determine what compliance looks like, it equally provides no "minimal guidelines to govern law enforcement." *City of Chicago v. Morales*, 527 U.S. 41, 60 (1999) (citation omitted). Enforcement thus turns on the Attorney

General's subjective judgment—his "personal predilections"—about whether Glass Lewis has done enough. *Kolender v. Lawson*, 461 U.S. 352, 358 (1983) (citation omitted).

147.    The stakes of this vagueness are severe. H.B. 1273 authorizes quasi-criminal civil penalties of up to $5,000 "per violation." Ind. Code § 24-5-0.5-4(g). Given the volume of Glass Lewis' proxy advisory activity, even a single proxy season of purported noncompliance could generate penalties in the tens of millions of dollars. That draconian enforcement threat compounds the chilling effect of the Act's ambiguity, deterring Glass Lewis from exercising its First Amendment rights.

148.    Because H.B. 1273's unconstitutionally vague provisions are integral to the entire law, the entire law must be invalidated and enjoined as to Glass Lewis. Unless invalidated and enjoined as to Glass Lewis, H.B. 1273 will deprive Glass Lewis of its due-process rights and cause it to suffer irreparable injuries.

## COUNT III

### U.S. Const., art. I, § 8, cl. 3.
### VIOLATION OF THE DORMANT COMMERCE CLAUSE

149.    Glass Lewis incorporates all prior paragraphs as though fully set forth herein.

150.    The Commerce Clause vests Congress with exclusive authority "[t]o regulate Commerce with foreign Nations, and among the several States." U.S. Const. art. I, § 8, cl. 3. Although the Constitution does not in terms limit the power of States to regulate commerce, "[the Supreme Court has] long interpreted the Commerce Clause as an implicit restraint on state authority, even in the absence of a conflicting federal statute." *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338 (2007); *see Nat'l Solid Wastes Mgmt. Ass'n v. Meyer*, 63 F.3d 652, 656-57 (7th Cir. 1995). The dormant Commerce Clause safeguards "the maintenance of a national economic union unfettered by state-imposed limitations

on interstate commerce" and the "autonomy of the individual States within their respective spheres." *Healy*, 491 U.S. at 335-36. These protections extend with equal force to foreign commerce. *See Wardair Canada, Inc. v. Fla. Dep't of Revenue*, 477 U.S. 1, 7-8 (1986); *South-Cent. Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 87-88 (1984).

151.    **<u>Direct regulation of out-of-state commerce.</u>** A state law violates the dormant Commerce Clause when it "directly regulates" commerce that "takes place[] wholly outside of the State's borders." *Legato Vapors*, 847 F.3d at 830 (quoting *Healy*, 491 U.S. at 336); *see Edgar v. MITE Corp.*, 457 U.S. 624, 642-43 (1982) (plurality op.); *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 376 n.1 (2023) (citing *Edgar*).

152.    H.B. 1273 directly regulates Glass Lewis' transactions with its non-Indiana clients. The Act imposes onerous burdens on Glass Lewis whenever Glass Lewis makes a recommendation against "entity management," even if neither the entity nor Glass Lewis' client (nor Glass Lewis itself) is located in Indiana. *See* H.B. 1273 § 2(a) (defining "entity" to include a "business corporation," "general partnership," "limited liability partnership," "limited partnership," or "limited liability company" as defined in Indiana Code § 23-0.5-1.5); Ind. Code § 23-0.5-1.5-3 ("'Business corporation' means a domestic business corporation . . . or a foreign business corporation."); H.B. 1273 § 6 (defining "interest holder" as a "direct holder of an interest in an entity").

153.    The application of H.B. 1273 to out-of-state transactions between Glass Lewis and Glass Lewis' non-Indiana clients violates the dormant Commerce Clause. *See, e.g.*, *Legato Vapors*, 847 F.3d at 830 ("[T]he application of a state statute" to out-of-state commerce "exceeds the inherent limits of the enacting State's authority and is invalid[.]") (quoting *Healy*, 491 U.S. at 336).

Unless invalidated and enjoined as to Glass Lewis' out-of-state transactions, H.B. 1273 will cause Glass Lewis to suffer irreparable injuries.

154.   **<u>Unduly burdening interstate and foreign commerce.</u>** A state law also violates the dormant Commerce Clause when its burden on interstate or foreign commerce "clearly exceeds [its] local benefits." *Wiesmueller v. Kosobucki*, 571 F.3d 699, 703 (7th Cir. 2009) (citation omitted) (dormant Interstate Commerce Clause); *see Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970) (same); *Ross*, 598 U.S. at 379 ("[T]his Court has left the courtroom door open to challenges premised on even nondiscriminatory burdens[.]") (citation and quotation marks omitted); *see also South-Central*, 467 U.S. at 99-101 (considering whether state law excessively burdened foreign commerce).

155.   H.B. 1273 imposes substantial burdens on interstate and foreign commerce that far exceed any putative local benefit. Although the Act is vague, under one reading the Act sweeps in every anti-management recommendation that any covered proxy advisor makes, anywhere in the world, about any company. Because proxy advisory firms are headquartered outside Indiana and overwhelmingly serve out-of-state and foreign clients, the Act's compliance burdens fall almost entirely on interstate and foreign commerce. Indeed, the Act was designed to burden out-of-state commerce: its sponsor noted that the bill was merely part of "a broader conversation across the country," not "a specific company in Indiana or specific issue, you know, vote that happened."[19]

156.   The resulting market distortion is itself a burden on commerce. If Indiana's approach is replicated by other states—as appears likely given the coordinated model-legislation campaign behind H.B. 1273—proxy advisors will face a patchwork of conflicting state disclosure

---

[19]   House Financial Institutions Committee Debate at 2:00:20-2:01:30 (Jan. 13, 2026), https://iga.in.gov/session/2026/video/house (select "Tuesday, Jan. 13" from "House – Financial Institutions" drop-down box).

regimes, each layering its own idiosyncratic requirements onto every recommendation. *See C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 406 (1994) (O'Connor, J., concurring in the judgment); *Brown-Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 583-84 (1986). Such balkanization is precisely the evil the dormant Commerce Clause is designed to prevent. And H.B. 1273's interference with foreign commerce is especially problematic given "the special need for federal uniformity" in "foreign intercourse and trade." *Wardair Canada*, 477 U.S. at 8.

157.    The substantial burdens H.B. 1273 imposes on interstate and foreign commerce outweigh any local interest Indiana may have in regulating how Glass Lewis serves its clients.

158.    To the extent Indiana has any local interests, they "could be promoted as well with a lesser impact on interstate activities," *Pike*, 397 U.S. at 142, including, for example, through educational campaigns.

159.    By imposing substantial burdens on interstate commerce that clearly exceed local benefits, H.B. 1273 violates the dormant Commerce Clause. Unless invalidated and enjoined as to Glass Lewis, H.B. 1273 will cause Glass Lewis to suffer irreparable injuries.

## REQUESTS FOR RELIEF

### EQUITABLE RELIEF

160.    Glass Lewis incorporates all prior paragraphs as though fully set forth herein.

161.    H.B. 1273 violates the Constitution and federal law, as applied to Glass Lewis, and deprives Glass Lewis of its enforceable rights secured by federal law.

162.    Federal courts have the power to enjoin actions by state officials that violate federal law. *Armstrong v. Exceptional Child Ctr.*, 575 U.S. 320, 326-27 (2015).

163. This Court can and should exercise its equitable power to enter a preliminary injunction and a permanent injunction precluding Attorney General Rokita (and those in his office) from enforcing H.B. 1273 against Glass Lewis.

**42 U.S.C. § 1983 AND 28 U.S.C. § 2201**
**DECLARATORY RELIEF**

164. Glass Lewis incorporates all prior paragraphs as though fully set forth herein.

165. For the reasons discussed above, H.B. 1273 violates the First and Fourteenth Amendments, including the Free Speech Clause and the Due Process Clause, as applied to Glass Lewis, and thereby deprives Glass Lewis of its enforceable rights.

166. For the reasons discussed above, H.B. 1273 is void for vagueness under the Due Process Clause of the Fourteenth Amendment, as applied to Glass Lewis.

167. For the reasons discussed above, H.B. 1273 violates the dormant Commerce Clause, U.S. Const., art. I, § 8, cl. 3, as applied to Glass Lewis.

168. With exceptions not relevant here, in any "case of actual controversy within [their] jurisdiction," federal courts have the power to "declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a).

169. This Court can and should exercise its power to enter a declaration that H.B. 1273 is unconstitutional and otherwise unlawful, as applied to Glass Lewis.

**<u>PRAYER FOR RELIEF</u>**

170. Glass Lewis respectfully requests that the Court:

171. Declare that H.B. 1273 is unlawful, as applied to Glass Lewis;

172. Declare that H.B. 1273 violates the First and Fourteenth Amendments, including the Free Speech Clause and the Due Process Clause, as applied to Glass Lewis;

173. Declare that H.B. 1273 is void for vagueness under the First Amendment and the Due Process Clause of the Fourteenth Amendment, as applied to Glass Lewis;

174. Declare that H.B. 1273 violates the Commerce Clause, U.S. Const., art. I, § 8, cl. 3, as applied to Glass Lewis;

175. Preliminarily and permanently enjoin Todd Rokita, in his official capacity as Attorney General of Indiana—and his successors, agents, employees, and all other persons who are in active concert or participation with the Attorney General—from enforcing H.B. 1273 against Glass Lewis, including by intervening in any action;

176. Enter judgment in favor of Glass Lewis;

177. Award Glass Lewis its reasonable attorneys' fees and costs incurred in bringing this action, under 42 U.S.C. § 1988(b) for successful 42 U.S.C. § 1983 claims against state officials; and

178. Award Glass Lewis all other relief as the Court deems just and proper.

Dated: April 30, 2026

Respectfully submitted,

**YETTER COLEMAN LLP**

/s/ *Bryce L. Callahan*

Bryce L. Callahan*
bcallahan@yettercoleman.com
Grant B. Martinez*
gmartinez@yettercoleman.com
Lily E. Hann*
lhann@yettercoleman.com
Jared LeBrun*
jlebrun@yettercoleman.com
811 Main Street, Suite 4100
Houston, Texas 77002
(713) 632-8000
(713) 632-8002 (fax)

* motion for leave to appear *pro hac vice* forthcoming

*Attorneys for Plaintiff Glass, Lewis & Co., LLC*