**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

|  |  |  |
|---|---|---|
| GLASS, LEWIS & CO., LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No.: 1:26-cv-00862-MPB-MKK |
| v. | ) | |
| | ) | |
| TODD ROKITA, in his official capacity as the Indiana Attorney General, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DEFENDANT'S OPPOSITION TO PLAINTIFF'S**
**MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................. ii

INTRODUCTION ........................................................................................................... 1

STATEMENT OF FACTS .............................................................................................. 1

    A.    Proxy Advisory Services............................................................................. 1

    B.    H.B. 1273 ..................................................................................................... 2

    C.    Procedural History .................................................................................... 3

ARGUMENT .................................................................................................................. 3

    I.    Glass Is Unlikely to Succeed On Its Constitutional Claims ......................... 4

        A.    Glass is unlikely to succeed on its First Amendment claim. ........................ 4

            1.    The Act is an ordinary commercial disclosure requirement under *Zauderer*.................................................................................... 4

            2.    Glass's attempt to characterize the Act as a content- or viewpoint-based restriction on speech fails. ...................................... 12

            3.    The Act is constitutional under *Zauderer* because it is reasonably related to the State's interests, including in preventing consumer deception. ......................................... 16

            4.    In the alternative, the Act satisfies exacting scrutiny. ........................ 20

        B.    Glass is unlikely to prevail on its claim that the Act is void for vagueness. ................................................................................................ 21

            1.    The Act has an ascertainable core of meaning................................... 22

            2.    Glass fails to demonstrate that the Act will be arbitrarily enforced........................................................................................ 28

    II.    The Balance of Equities and Public Interest Weigh Against An Injunction............... 29

    III.    In the Alternative, the Act Is Severable and Any Injunction Should Be Limited. ..................................................................................................... 30

CONCLUSION............................................................................................................. 30

**TABLE OF AUTHORITIES**

**Cases**                                                                  **Page(s)**

*Alexander v. Linkmeyer Dev. II, LLC,*
    119 N.E.3d 603 (Ind. Ct. App. 2019) ...................................................................... 27

*Am. Film Distribs., Inc. v. State,*
    471 N.E.2d 3 (Ind. Ct. App. 1984) ......................................................................... 29

*Am. Future Sys., Inc. v. Penn. State Univ.,*
    752 F.2d 854 (3d Cir. 1984) .................................................................................... 7

*Am. Hosp. Ass'n v. Azar,*
    983 F.3d 528 (D.C. Cir. 2020) ............................................................................... 6

*Ams. for Prosperity Found. v. Bonta,*
    594 U.S. 595 (2021) ........................................................................................ 20, 21

*Ariix, LLC v. NutriSearch Corp.,*
    985 F.3d 1107 (9th Cir. 2021) ................................................................................ 6

*Baker v. Fenneman & Brown Props., LLC,*
    793 N.E.2d 1203 (Ind. Ct. App. 2003) .................................................................. 25

*Bamboo Bros. v. Carpenter,*
    183 Cal. Rptr. 748 (Ct. App. 1982) ....................................................................... 27

*Bantam Books, Inc. v. FTC,*
    275 F.2d 680 (2d Cir. 1960) ................................................................................... 27

*Bauer v. Shepard,*
    620 F.3d 704 (7th Cir. 2010) .................................................................................. 28

*Briggs & Stratton Corp. v. Baldrige,*
    728 F.2d 915 (7th Cir. 1984) ............................................................................... 6, 8

*Brooks v. Chi. Downs Ass'n, Inc.,*
    791 F.2d 512 (7th Cir. 1986) .................................................................................. 18

*Brown v. Chi. Bd. of Educ.,*
    824 F.3d 713 (7th Cir. 2016) .................................................................................. 24

*Chamber of Com. of U.S. v. SEC,*
    85 F.4th 760 (5th Cir. 2023) ......................................................................... 9, 16, 18

*Citizens United v. FEC,*
    558 U.S. 310 (2010) .............................................................................................. 21

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC,*
    596 U.S. 61 (2022) ................................................................................................ 14

ii

*City of Hammond v. Herman & Kittle Props., Inc.*,
119 N.E.3d 70 (Ind. 2019) ........................................................................ 30

*City of Indianapolis v. Falvey*,
296 N.E.2d 896 (Ind. Ct. App. 1973) ........................................................ 25

*Conn. Bar Ass'n v. United States*,
620 F.3d 81 (2d Cir. 2010) ........................................................................ 19

*Curtis v. Thompson*,
840 F.2d 1291 (7th Cir. 1988) ................................................................... 13

*Ent. Software Ass'n v. Blagojevich*,
469 F.3d 641 (7th Cir. 2006) ............................................................. 5, 8, 13

*Fla. Bar v. Went For It, Inc.*,
515 U.S. 618 (1995) .................................................................................. 19

*Ford Dealers Ass'n v. Dep't of Motor Vehicles*,
650 P.2d 328 (Cal. 1982) ........................................................................... 27

*GEFT Outdoor, L.L.C. v. City of Westfield*,
491 F. Supp. 3d 387 (S.D. Ind. 2020) ....................................................... 30

*GEFT Outdoor, LLC v. City of Westfield*,
39 F.4th 821 (7th Cir. 2022) ................................................................ 20, 21

*Gen. Grain, Inc. v. Goodrich*,
233 N.E.2d 187 (Ind. Ct. App. 1968) ........................................................ 25

*Gresham v. Peterson*,
225 F.3d 899 (7th Cir. 2000) ..................................................................... 22

*Hill v. Colorado*,
530 U.S. 703 (2000) .................................................................................. 16

*Hinshaw v. Bd. of Comm'rs of Jay Cnty.*,
611 N.E.2d 637 (Ind. 1993) ....................................................................... 24

*Hygrade Provision Co. v. Sherman*,
266 U.S. 497 (1925) .................................................................................. 24

*In re R. M. J.*,
455 U.S. 191 (1982) .................................................................................. 18

*Johnson v. United States*,
576 U.S. 591 (2015) .................................................................................. 23

*Jordan v. De George*,
341 U.S. 223 (1951) .................................................................................. 23

iii

*Jordan v. Jewel Food Stores, Inc.*,
743 F.3d 509 (7th Cir. 2014) ................................................................................ 6, 7

*K.C. v. Individual Members of Med. Licensing Bd. of Ind.*,
121 F.4th 604 (7th Cir. 2024) ................................................................................... 29

*K-S Pharmacies, Inc. v. Am. Home Prods. Corp.*,
962 F.2d 728 (7th Cir. 1992) ................................................................................... 25

*LaBauve v. La. Wildlife & Fisheries Comm'n*,
444 F. Supp. 1370 (E.D. La. 1978) ......................................................................... 27

*Leavitt v. Jane L.*,
518 U.S. 137 (1996) ................................................................................................ 30

*LSP Transmission Holdings II, LLC v. Huston*,
131 F.4th 566 (7th Cir. 2025) ................................................................................. 30

*Maryland v. King*,
567 U.S. 1301 (2012) .............................................................................................. 29

*McCutcheon v. FEC*,
572 U.S. 185 (2014) ................................................................................................ 20

*McNeil v. Anonymous Hosp.*,
219 N.E.3d 789 (Ind. Ct. App. 2023) ...................................................................... 15

*Md. Shall Issue, Inc. v. Anne Arundel County*,
91 F.4th 238 (4th Cir. 2024) ............................................................................ *passim*

*Meese v. Keene,*
481 U.S. 465 (1987) .......................................................................................... 20, 21

*N.Y. Horse & Carriage Ass'n v. City of New York*,
545 N.Y.S.2d 439 (N.Y. Sup. Ct. 1989) ................................................................. 27

*Nat'l Ass'n of Broadcasters v. FCC*,
147 F.4th 978 (D.C. Cir. 2025) ............................................................................... 21

*Nat'l Elec. Mfrs. Ass'n v. Sorrell*,
272 F.3d 104 (2d Cir. 2001) ........................................................................... 5, 10, 12

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
585 U.S. 755 (2018) ........................................................................... 5, 8, 10, 18

*Nken v. Holder*,
556 U.S. 418 (2009) ................................................................................................ 29

*NLRB v. Loc. 239, Int'l Bhd. of Teamsters*,
289 F.2d 41 (2d Cir. 1961) ...................................................................................... 23

*Ohralik v. Ohio State Bar Ass'n*,
436 U.S. 447 (1978) ...................................................................................... 13

*Orth v. Smedley*,
378 N.E.2d 20 (Ind. Ct. App. 1978) ............................................................ 25

*Paramount Commc'ns, Inc. v. Time Inc.*,
571 A.2d 1140 (Del. 1989) ........................................................................... 24

*Parents Protecting Our Child., UA v. Eau Claire Area Sch. Dist.*,
95 F.4th 501 (7th Cir. 2024) ........................................................................ 22

*Paris Adult Theatre I v. Slaton*,
413 U.S. 49 (1973) ........................................................................................ 13

*Patriotic Veterans, Inc. v. Zoeller*,
845 F.3d 303 (7th Cir. 2017) ........................................................................ 14

*People v. Becker*,
759 P.2d 26 (Colo. 1988) .............................................................................. 25

*Pharm. Care Mgmt. Ass'n v. Rowe*,
429 F.3d 294 (1st Cir. 2005) .......................................................................... 4

*Pharm. Rsch. & Mfrs. of Am. v. Stolfi*,
153 F.4th 795 (9th Cir. 2025) ............................................................... 4, 7, 12

*Powell v. State*,
151 N.E.3d 256 (Ind. 2020) .......................................................................... 29

*Pub. Citizen, Inc. v. Pinellas County*,
321 F. Supp. 2d 1275 (M.D. Fla. 2004) ....................................................... 20

*Richwine v. Matuszak*,
707 F. Supp. 3d 782 (N.D. Ind. 2023) ............................................................ 6

*Rimmer v. Colt Indus. Operating Corp.*,
656 F.2d 323 (8th Cir. 1981) ........................................................................ 23

*SEC v. AT&T, Inc.*,
626 F. Supp. 3d 703 (S.D.N.Y. 2022) ..................................................... 13, 21

*Smiley v. Jenner*,
173 F.4th 865 (7th Cir. 2026) .................................................................. 22, 28

*Smith v. Goguen*,
415 U.S. 566 (1974) ...................................................................................... 29

*State ex rel. Hechler v. Christian Action Network*,
491 S.E.2d 618 (W. Va. 1997) ...................................................................... 28

*StreetMediaGroup, LLC v. Stockinger*,
  79 F.4th 1243 (10th Cir. 2023).................................................................................... 14

*Trs. of Ind. Univ. v. Curry*,
  918 F.3d 537 (7th Cir. 2019)..................................................................................... 22

*United States v. Barona*,
  59 F.3d 176 (Table), 1995 WL 365461 (9th Cir. 1995)........................................ 27

*United States v. Benson*,
  561 F.3d 718, 725 (7th Cir. 2009)............................................................................... 6

*United States v. Cook*,
  782 F.3d 983 (8th Cir. 2015)..................................................................................... 25

*United States v. Pommerening*,
  500 F.2d 92 (10th Cir. 1974)..................................................................................... 25

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
  455 U.S. 489 (1982) .................................................................................................. 22

*Volokh v. James*,
  148 F.4th 71 (2d Cir. 2025)........................................................................................ 9

*Vrljicak v. Holder*,
  700 F.3d 1060 (7th Cir. 2012)............................................................................. 23, 25

*Ward v. Rock Against Racism*,
  491 U.S. 781 (1989) .............................................................................................. 14, 22

*Wiemerslage v. Maine Twp. High Sch. Dist. 207*,
  29 F.3d 1149 (7th Cir. 1994)..................................................................................... 25

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ............................................................................................... 1, 3, 4

*Wis. Educ. Ass'n Council v. Walker*,
  705 F.3d 640 (7th Cir. 2013)..................................................................................... 16

*X Corp. v. Bonta*,
  116 F.4th 888 (9th Cir. 2024)...................................................................................... 7

*Zauderer v. Off. of Disciplinary Couns. of Sup. Ct. of Ohio*,
  471 U.S. 626 (1985) ........................................................................................... *passim*

**Statutes**

15 U.S.C. § 77q....................................................................................................... 13

2026 Kansas Laws Ch. 146 (S.B. 375) ........................................................................ 2

Ind. Code § 1-1-1-8 ........................................................................................................... 30

Ind. Code § 2-5-1.1-16 ...................................................................................................... 15

Ind. Code § 2-5-1.1-17 ...................................................................................................... 15

Ind. Code § 23-1-35-1 ........................................................................................................ 24

Ind. Code § 24-5-0.5-2 ......................................................................................................... 3

Ind. Code § 24-5-0.5-3 .................................................................................................... 3, 22

Ind. Code § 24-5-0.5-4 ............................................................................................... 3, 22, 29

Tex. Bus. Orgs. Code § 6A.101 ...................................................................................... 2, 11

**Treatises**

Corporate Acquisitions § 8:55 (2026) ................................................................................ 24

Harold S. Bloomenthal & Samuel Wolff,
  Securities Law Handbook § 12:126 (Oct. 2025 update) .................................................... 5

**Other Authorities**

Black's Law Dictionary (12th ed. 2024) .............................................................................. 25

Cambridge Business English Dictionary (2011) .................................................................. 23

Michael Cappucci,
  *The Proxy War Against Proxy Advisors*, 16 N.Y.U. J.L. & Bus. 579 (2020) ..................... 2

George W. Dent, Jr.,
  *A Defense of Proxy Advisors*, 2014 Mich. St. L. Rev. 1287 ............................................... 2

Asaf Eckstein,
  *Skin in the Game for Credit Rating Agencies and Proxy Advisors:*
  *Reality Meets Theory*, 7 Harv. Bus. L. Rev. 221 (2017) .................................................... 18

Yonca Ertimur et al.,
  *Shareholder Votes and Proxy Advisors: Evidence from Say on Pay*,
  51 J. Acct. Res. 951 (2013) ............................................................................................... 18

H.B. 1273, 124th Gen. Assemb., 2d Reg. Sess. (Ind. 2026) ............................................ *passim*

*Merriam-Webster.com Dictionary,* Merriam-Webster ......................................................... 28

Antonin Scalia & Bryan Garner,
  *Reading Law: The Interpretation of Legal Texts* (2012) ..................................................... 27

## INTRODUCTION

The Indiana General Assembly, recognizing the influence of proxy advisors over Indiana investors and businesses, enacted House Enrolled Act No. 1273 ("H.B. 1273" or the "Act")—a straightforward piece of legislation requiring proxy advisors to disclose whether their advice is based on financial analysis. Specifically, it requires a proxy advisory firm making a recommendation to vote against a proposal by company management to Hoosiers or in connection with an Indiana business to disclose if that recommendation is not based on a financial analysis. In doing so, the Act protects those relying on proxy advisors' advice, which is especially important in such a highly concentrated market dominated by two firms—Plaintiff Glass, Lewis & Company ("Glass"), and Institutional Shareholder Services ("ISS").

Glass faces a high burden in seeking a preliminary injunction against enforcement of the Act's requirements. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Glass does not carry that burden here. Its First Amendment claim is unlikely to succeed because the Act's disclosure requirements are a permissible regulation of commercial speech. Glass's void for vagueness claim is also unlikely to succeed because it is a disfavored pre-enforcement facial challenge to a statute whose meaning is readily discernable. Finally, Glass has not shown the other preliminary injunction factors favor it, and thus this Court should deny its motion.

## STATEMENT OF FACTS

### A.    Proxy Advisory Services

Just two firms—Glass and ISS—control between 84 percent and 90 percent of the market for proxy advisory services. *See* Dkt. 35-1 at 3 (Stephanie L. Freudenberg Decl., Ex. A at 2). According to one estimate, "as of 2021 . . . Glass Lewis h[eld] 42 percent" of the proxy advice market for U.S. mutual funds, "with $23.6 trillion in assets across 94 fund families." *Id*. Today,

Glass publicly boasts of advising shareholders that oversee $40 trillion in assets. Dkt. 35-2 at 2 (Freudenberg Decl. Ex. B).

Further, because institutional investors—like the ones proxy advisors serve—hold 70% of public shares in U.S. stock exchanges, proxy advisors have massive sway over the economy. *See* Michael Cappucci, *The Proxy War Against Proxy Advisors*, 16 N.Y.U. J.L. & Bus. 579, 582 (2020). But there are concerns that proxy advisors are "compromised by conflicts of interest." *Id.* at 600–02. Another concern is that proxy advisors are not required to register under the federal Investment Advisers Act, and therefore "are not deemed fiduciaries[.]" George W. Dent, Jr., *A Defense of Proxy Advisors*, 2014 Mich. St. L. Rev. 1287, 1321–22. Glass is among those not registered. Dkt. 35-3 at 28 (Freudenberg Decl. Ex. C (Wieck Dep. 43:7–9)). Given these concerns and proxy advisors' influence, Indiana joined several other states that have enacted statutes regulating proxy advisors. *See* Tex. Bus. Orgs. Code § 6A.101(b)(3); 2026 Kansas Laws Ch. 146 (S.B. 375).

### B.    H.B. 1273

The Indiana General Assembly enacted H.B. 1273 in March 2026. *See* Dkt. 23-4 (H.B. 1273, 124th Gen. Assemb., 2d Reg. Sess. (Ind. 2026)). It consists of four sections. Section 1 creates a new chapter of the Indiana Code—Section 24-4-27.5, entitled "Proxy Advisors." *See* H.B. 1273 § 1. Starting July 1, 2026, a proxy advisory firm like Glass must make certain disclosures if it provides proxy advisory services (1) to Hoosiers or in connection with Indiana businesses, that (2) recommend voting against management's proposals, if (3) the recommendations are not based on "written financial analysis." H.B. 1273 § 1-11. The statute defines "written financial analysis" as "a written document that: . . . analyzes the expected short term and long term financial benefits and costs to an entity of implementing an entity proposal or proxy proposal; . . . concludes what vote or course of action is most likely to positively affect interest holder value; and . . . explains

2

the methods and processes used to prepare the analysis, including the experience and geographic location of the personnel who formed the conclusion." *Id.* § 1.10.

Sections 2, 3 and 4 of H.B. 1273—which Glass does not challenge—amend existing Indiana law. Specifically, Section 2 amends Indiana Code § 24-5-0.5-2 by adding definitions of "Local agency," "Political subdivision," and "State agency" and amending the definitions of "Consumer transaction" and "Supplier." *See* H.B. 1273 §§ 2-1, 2-3, 2-9 through 2-12. Section 3 amends Indiana Code § 24-5-0.5-3 to add "[a] violation of IC 24-4-27.5 (concerning proxy advisors), as set forth in IC 24-4-27.5-12" to the list of deceptive acts prohibited by Indiana law. *See* H.B. 1273 § 3(b)(44). And Section 4 amends Indiana Code § 24-5-0.5-4 to allow attorneys acting on behalf of local agencies to bring certain actions under Indiana law. *See* H.B. 1273 § 4.

### C.    Procedural History

Glass filed this lawsuit on April 30, 2026, asserting that the Act is invalid under three constitutional provisions: (1) under the First Amendment, as content and viewpoint discrimination, Dkt. 1 ¶¶ 101–36; (2) under the First and Fourteenth Amendments, as void for vagueness, *id.* ¶¶ 137–48; and (3) under the Dormant Commerce Clause, for regulating out-of-state commerce and burdening interstate commerce, *id.* ¶¶ 149–59. On May 8, 2026, Glass filed its Motion for Preliminary Injunction, asking this Court to enjoin enforcement of the Act against Glass. *See* Dkt. 23.

### ARGUMENT

The Supreme Court has instructed that "a plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. And a preliminary injunction is "an extraordinary

remedy" that is "never awarded as of right." *Id*. at 24 (citation omitted). As demonstrated below, Glass does not meet these requirements, and its preliminary injunction motion should be denied.

## I. Glass Is Unlikely to Succeed On Its Constitutional Claims

Glass's motion fails at the threshold because all of its claims are unlikely to succeed.

### A. Glass is unlikely to succeed on its First Amendment claim.

Glass challenges three provisions of the Act (together, the "Disclosure Requirements") as violative of the First Amendment for supposedly suppressing certain viewpoints and content and compelling speech: (1) the requirement to disclose to interest holders when Glass's recommendations against company management are not based on financial analysis (the "Client Disclosures"); (2) the requirement to disclose that same information to company management (the "Management Disclosures"); and (3) the requirement that Glass conspicuously display on its internet homepage that it has made recommendations against company management not based on financial analysis (the "Website Disclosures"). *See* H.B. 1273 §§ 1-11(a)(1)–(a)(3). But Glass's arguments fail because they proceed from the wrong premise, apply the wrong test, and reach the wrong conclusion.

#### 1. The Act is an ordinary commercial disclosure requirement under *Zauderer*.

H.B. 1273 is a valid exercise of the State's police power. The Act, in requiring firms to be transparent about the services they sell, calls for a "routine disclosure of economically significant information designed to forward ordinary regulatory purposes[.]" *Pharm. Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 316 (1st Cir. 2005). Such disclosure requirements "typically will not 'require an extensive First Amendment analysis.'" *Pharm. Rsch. & Mfrs. of Am. v. Stolfi*, 153 F.4th 795, 815 (9th Cir. 2025) (quoting *Rowe*, 429 F.3d at 316), *cert. petition docketed sub nom. Pharm. Rsch. & Mfrs. of Am. v. O'Day,* No. 25-1018 (U.S. Feb. 24, 2026). Glass's argument that H.B. 1273

4

"burdens . . . particular views," Dkt. 24 at 14, "overlooks material differences between disclosure requirements and outright prohibitions on speech." *Zauderer v. Off. of Disciplinary Couns. of Sup. Ct. of Ohio*, 471 U.S. 626, 650 (1985). Indiana "has not attempted to prevent" proxy advisors "from conveying information to the public; it has only required them to provide somewhat more information than they might otherwise be inclined to present." *Id.*

For similar reasons, Glass's argument that H.B. 1273 "compels" speech, Dkt. 24 at 17–18, is also misplaced. "Particularly in the commercial arena, the Constitution permits the State to require speakers to express certain messages without their consent, the most prominent examples being warning and nutritional information labels." *Ent. Software Ass'n v. Blagojevich*, 469 F.3d 641, 651 (7th Cir. 2006). Starting with *Zauderer*, the Supreme Court's "precedents have applied more deferential review to some laws that require professionals to disclose factual, noncontroversial information in their 'commercial speech.'" *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 768 (2018) (*NIFLA*). A compelled disclosure is constitutional if it is "reasonably related to the State's interest in preventing deception of consumers," *Zauderer*, 471 U.S. at 651, or another valid regulatory purpose.[1] H.B. 1273's Disclosure Requirements meet these criteria and are therefore properly evaluated under *Zauderer*'s more deferential standard of review.

***The Act regulates commercial speech***. Glass attempts to avoid this framework by arguing that its speech is not "advertising" and therefore is not commercial speech. *See* Dkt. 24 at 22. But Glass is mistaken: "[c]ommercial speech is not confined to … just 'speech that proposes a

---

[1] Every court of appeals to consider the question has "held that *Zauderer* applies to more than disclosure requirements aimed at correcting consumer deception." Harold S. Bloomenthal & Samuel Wolff, Securities Law Handbook § 12:126 (Oct. 2025 update). *See, e.g.*, *Md. Shall Issue, Inc. v. Anne Arundel County*, 91 F.4th 238, 247 (4th Cir. 2024), *cert. denied,* 145 S. Ct. 152 (2024). In line with this consensus, the Seventh Circuit favorably cited a Second-Circuit case upholding under *Zauderer* a disclosure mandate unrelated to preventing deception. *See Ent. Software Ass'n*, 469 F.3d at 651–52 (citing *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 115 (2d Cir. 2001)).

commercial transaction.'" *Richwine v. Matuszak*, 707 F. Supp. 3d 782, 801 n.9 (N.D. Ind. 2023) (quoting *Jordan v. Jewel Food Stores, Inc.*, 743 F.3d 509, 516 (7th Cir. 2014)), *aff'd*, 148 F.4th 942 (7th Cir. 2025). Rather, "[t]he hallmark of commercial speech is that it pertains to commercial transactions, whether those proposed through product advertising …, or *implicated in some other manner*." *Briggs & Stratton Corp. v. Baldrige,* 728 F.2d 915, 917–18 (7th Cir. 1984) (emphasis added). The Seventh Circuit has set forth "relevant considerations" to determining if speech is commercial: "'whether: (1) the speech is an advertisement; (2) the speech refers to a specific product; and (3) the speaker has an economic motivation for the speech.'" *Jordan*, 743 F.3d at 517 (quoting *United States v. Benson*, 561 F.3d 718, 725 (7th Cir. 2009)). "This is just a general framework, however," and "all [these factors] are not necessary." *Id.* A company's "economic motivation is not limited simply to the expectation of a direct commercial transaction with consumers." *Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1117 (9th Cir. 2021). The Seventh Circuit thus held in *Briggs & Stratton* that companies that did business with Arab countries were engaged in "commercial speech" for First Amendment purposes when the companies answered questionnaires from those countries regarding an Arab boycott of Israel, even though their survey responses were obviously not advertisements. 728 F.2d at 918. "The *Zauderer* standard" is likewise not "limited to restrictions on advertising and point-of-sale labeling"; it has been "appl[ied] …, for example, to court-mandated disclosures on websites," *Am. Hosp. Ass'n v. Azar*, 983 F.3d 528, 541 (D.C. Cir. 2020), and "assembly or user instructions, information about the product or service, disclaimers, and warnings on health and safety." *Md. Shall Issue*, 91 F.4th at 248.

Based on the foregoing criteria, the Disclosure Requirements are regulations of commercial speech. The Requirements "pertain[] to commercial transactions," *Briggs & Stratton*, 728 F.2d at

6

917, and the obligatory disclosures "refer[] to a specific product." *Jordan*, 743 F.3d at 517 (citation omitted). The commercial speech the Act regulates is not the *content* of Glass's recommendations. *Cf.* Dkt. 24 at 21. Rather, H.B. 1273 requires proxy advisors to tell their clients a basic fact about the services the advisors provide: whether their advice is based on "financial analysis" as defined by the Act. Transparency on this point benefits consumers of proxy advice, as well as retail investors whose money is managed by proxy advisors' clients, by giving them information necessary to evaluate the advice's quality. This is "speech connected with the sale of . . . a service—promoting the product or service, explaining it, or giving warnings about it"—and hence "is commercial." *Md. Shall Issue*, 91 F.4th at 248. Although it may "not 'propose a commercial transaction,'" "the commercial speech doctrine" applies here "because [the disclosures] nonetheless provided parties to 'actual or potential' commercial transactions with information about those transactions." *Stolfi,* 153 F.4th at 821 (quoting *X Corp. v. Bonta*, 116 F.4th 888, 901 (9th Cir. 2024)). And the Act requires disclosures only from those who give proxy advice "for compensation." H.B. 1273 § 1-7.

Further, that proxy advisors "ha[ve] an economic motivation for the speech" affected by the law confirms that it is indeed a commercial-speech regulation. *Jordan*, 743 F.3d at 517 (citation omitted). Glass's argument to the contrary is unavailing. *Cf.* Dkt. 24 at 21–22. Glass has identified no support for its position that an economic motivation for the "substance" of its recommendations is required for speech to be commercial in nature. *Id.* And it cannot deny that it has an "economic motivation" for *making* the recommendations. *Am. Future Sys., Inc. v. Penn. State Univ.*, 752 F.2d 854, 862 (3d Cir. 1984) (relevant factor for commercial speech is whether "the speaker had an economic motive for making the speech"). *See also* Dkt. 24 at 25 (complaining that the Act requires Glass to give away "valuable work product for free"); Dkt. 35-3 at 13–14, 17

7

(Freudenberg Decl. Ex. C (Wieck Dep. at 17–18, 21) (explaining that Glass generally refuses to share reports to anyone who does not pay for them)).

Glass is also incorrect in arguing that the regulated speech is not commercial because it is "delivered after the commercial transaction has been completed." Dkt. 24 at 21. Glass charges money for access to proxy advice, and the transaction involves both a client's payment *and* the provision of the advice. Dkt. 35-3 at 12–13 (Freudenberg Decl. Ex. C (Wieck Dep. at 16–17)). Moreover, many regulations are regulations of commercial speech even though they apply after the sale of a product or service is complete. *See, e.g.*, *Md. Shall Issue*, 91 F.4th at 248.

Lastly, Glass cannot remove its proxy advice from the realm of commercial speech by arguing that some recommendations pertain to "significant, newsworthy questions" and "'matters of public concern,'" such as climate change. Dkt. 24 at 21 (citation omitted from second quotation). The Disclosure Requirements are neutral as to topic. Further, the nature of proxy recommendations is commercial, and therefore the Disclosure Requirements are regulations of commercial speech. *See Briggs & Stratton*, 728 F.2d at 917 (speech is commercial if it "pertains to commercial transactions").

***The Act requires disclosure of factual, noncontroversial information***. Glass is also mistaken in contending that the Disclosure Requirements compel "'controversial,'" "'subjective,'" and "misleading[]" statements. Dkt. 24 at 22, 18 (quoting *Ent. Software Ass'n*, 469 F.3d at 652). H.B. 1273 requires only "disclos[ure] [of] factual, noncontroversial information": whether or not Glass's proxy advice is based on financial analysis. *See NIFLA*, 585 U.S. at 768. The required statements are in no way "misleading," and Glass's misinterpretations of the Act cannot render them so. For example, Glass is wrong that the Act's disclosures are "all-or-nothing." Dkt. 24 at 9. Nothing in the Act prohibits Glass from *adding* clarifying information to its disclosures, including

8

why it did not perform a "written financial analysis" defined by the Act, that it performed some but not all aspects of such analysis, or that it performed other kinds of analysis that do not fall within the Act's definition. Glass's "free[dom] to speak (or not) however and whenever it wishes apart from" the obligatory disclosures reinforces the Act's validity. *See Chamber of Com. of U.S. v. SEC*, 85 F.4th 760, 772 (5th Cir. 2023). For this reason, Glass is wrong that the Act "forces" it to "voice the opinion that [financial] analyses are always possible" or to "denigrate itself for failing to conduct [a] generally impossible [financial] analysis." Dkt. 24 at 24.

Similarly, Glass is wrong that the Act requires it "to say that there is a single, correct answer on shareholder votes." *Id.* at 23. Nothing in the Act requires proxy advisors to make any recommendation—only to disclose, in some circumstances, where its recommendations are not based on financial analysis. That Glass's clients may "have different investment strategies" and "views about what serves their financial interests," *id.* at 23, is similarly irrelevant to the requirement to disclose whether advice is based on financial analysis. As is Glass's assertion that some proposals are "not susceptible" to "quantifiable analysis." *Id.* at 5. Again, the Act does not prevent Glass from stating that an issue does not lend itself to a particular kind of analysis.

Glass is also wrong that the Act will "[c]ompel[] Glass Lewis to provide . . . opinion[s] on hotly contested matters of judgment." *Id.* at 24. The Act requires only that Glass disclose whether its recommendations against management are based on financial analysis—a statement that is not itself "controversial." *See Volokh v. James*, 148 F.4th 71, 90 (2d Cir. 2025) (holding that law requiring social media networks to disclose their content moderation policies was not "controversial" for *Zauderer* purposes because "though the policies themselves might be controversial, the fact that *they are what they are* is not"), *certified question accepted,* 267 N.E.3d 1245 (N.Y. 2025).

Glass next attacks the Act's Website Disclosure, which requires a proxy advisor to display on its internet homepage that it makes recommendations against management that are not based on financial analysis. Glass says it will be forced to "broadcast[]" "a misleading and self-denigrating statement." Dkt. 24 at 25. But again, the required disclosures are neither "misleading" nor "denigrating," and there is a good reason why they should appear on an advisor's website: so that prospective clients will understand the advisor's criteria for making recommendations. A "compelled disclosure . . . intended . . . to better inform consumers about the products they purchase" is "[]consistent with the policies underlying First Amendment protection of commercial speech." *Nat'l Elec. Mfrs.*, 272 F.3d at 115. The Website Disclosure is of a piece with other regulations of "commercial speech" that courts routinely uphold, "includ[ing] the advertising and promotion of products and services, assembly or user instructions, information about the product or service, [and] disclaimers." *Md. Shall Issue*, 91 F.4th at 248.

***The Act is not unduly burdensome***. H.B. 1273 also fulfills *Zauderer*'s criterion that disclosure requirements not be unduly burdensome. *Cf. NIFLA*, 585 U.S. at 768. The Act merely requires that, if a recommendation against management is made without financial analysis, disclosures to this effect be made; and if financial analysis *is* performed, that analysis must be available to interest holders upon request.

Glass's laundry list of objections as to burden are without support. First, Glass states that its reports to clients contain exhaustive, detailed analysis of various issues. Dkt. 24 at 5. Glass has not shown that, if it chooses to base a recommendation against management on a "written financial analysis," that it would unduly burden Glass to provide that analysis if requested to do so. Nor should it unduly burden Glass to include with its recommendations against management a short, formulaic disclosure that the recommendation is not based on such "financial analysis" when Glass

10

does not conduct such an analysis. John Wieck, Glass's declarant, confirmed as much during his deposition when he testified that Glass's practice is to make "business disclosures" of its potential conflicts of interest in every report where such disclosures may be necessary. Dkt. 35-3 at 39–40 (Freudenberg Decl. Ex. C (Wieck Dep. 66–67)). The disclosures required by H.B. 1273 may be made in this or a similar manner.

Second, Glass does not point to any evidence that the Website Disclosure is burdensome. In fact, two of Glass's competitors have already complied with the materially similar provision in Texas' recently enacted law, *see* Tex. Bus. Orgs. Code § 6A.101(b)(3). *See* Dkt. 35-4 at 2 (Freudenberg Decl. Ex. D); Dkt. 35-5 at 5 (Freudenberg Decl. Ex. E).

Third, Glass is incorrect that the Required Disclosures "expos[e] individual employees to . . . harassment . . . ." Dkt. 24 at 25 (citing Wieck Decl. ¶ 38 (Dkt. 23-2)). The Act does not require Glass to identify any employees—simply to disclose contributing employees' location and experience. Something along the lines of "this analysis was performed by an accountant based in Minneapolis with 10 years' experience" would be sufficient.

Fourth, Glass's argument that the required disclosures are "misleading and self-denigrating" is wrong. *Cf.* Dkt. 24 at 25. Nothing in the Act prevents Glass from clarifying the basis for its recommendations when it does not perform a financial analysis. And Glass's disagreement with the Disclosure Requirement does not render the disclosures "burdensome" per the *Zauderer* test, or else disclosure requirements would be unconstitutional every time a regulated party objected enough to mount a legal challenge.

Fifth, Glass's argument that the Act forces it "to reveal confidential information about the proprietary investment management strategies of its clients" to corporate management, Dkt. 23-2 ¶ 55, is based on a misreading of the statute. The Act merely requires that a proxy advisor

11

"identif[y] the services being provided" (i.e., proxy voting advice), "the recommendation or policy at issue" (i.e., that there exists a policy relevant to the recommendation), and the fact that the advisor did not use a "financial analysis" as defined by the statute in making the recommendation. *See* H.B. 1273 §§ 1-11(a)(1), (2). None of this basic information consists of clients' "proprietary investment management strategies."

Relatedly, Glass objects to the Act's requirement that it provide to company management a copy of any "written financial analysis" on which a recommendation against that management is based. *See* Dkt. 24 at 25 (citing H.B. 1273 § 1-11(a)(3)). But nothing in the Act requires it to provide their entire "work product"—only enough information to meet the Act's criteria for "written financial analysis." Indeed, Glass's principal competitor ISS makes available its reports of recommendations regarding proxy votes to the companies to which the reports pertain, if those reports are produced pursuant to ISS's benchmark policy. *See* Dkt. 35-6 at 15–18 (Freudenberg Decl. Ex. F (Goldstein Dep. 26–29)).

Glass cites no authority for the proposition that it can evade commercial-speech regulation by self-servingly declaring the information it does not want to disclose "confidential." *See Stolfi*, 153 F.4th at 825 n.24 (rejecting "proposition that confidentiality has a role to play in our First Amendment analysis" of commercial disclosure requirement). "Courts have accorded less weight to [privacy] concerns . . . in commercial settings and to corporate plaintiffs than where an individual's personal privacy is involved." *Nat'l Elec. Mfrs.*, 272 F.3d at 114.

> **2.    Glass's attempt to characterize the Act as a content- or viewpoint-based restriction on speech fails.**

Still attempting to stave off application of the *Zauderer* standard, Glass argues that the Disclosure Requirements unconstitutionally discriminate based on content and viewpoint. Dkt. 24 at 13–17. But this contention is mistaken because the Act does not target speech about any

12

particular topic, nor does it regulate speech because of the State's disagreement with the message conveyed. While the Disclosure Requirements' applicability depends on the relation between a proxy advisor's recommendation and that of company management, this distinction rests on the different roles of the two groups in corporate governance and their different incentives and duties, not the substantive views they express. Precedent establishes that commercial speech laws that make analogous distinctions are not impermissibly content- or viewpoint-based.

To start, "regulation of commercial speech based upon content is less problematic" than of other speech; "[b]ecause of the greater potential for deception or invasions of privacy . . . , content-based restrictions on commercial speech are more often upheld." *Curtis v. Thompson*, 840 F.2d 1291, 1298 (7th Cir. 1988). Many have "pointed out the ubiquity of valid laws that differentiate on the basis of communicative content." *SEC v. AT&T, Inc.*, 626 F. Supp. 3d 703, 744 (S.D.N.Y. 2022). There are "[n]umerous examples" of "communications that are regulated without offending the First Amendment, such as the exchange of information about securities, [and] corporate proxy statements . . . ." *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456 (1978). "[T]he First Amendment [does] no[t] . . . preclude[] States from having 'blue sky' laws to regulate what sellers of securities may write or publish about their wares." *Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 64 (1973). This is especially true of laws that, like H.B. 1273, only call for factual disclosures. "Particularly in the commercial arena, the Constitution permits the State to require speakers to express certain messages without their consent[.]" *Ent. Software Ass'n*, 469 F.3d at 651. For instance, 15 U.S.C. § 77q(b)—which has been "consistently upheld"—"obliges publicists to review the content" of statements "touting stocks, and to publicly disclose those as to which they received consideration from an issuer for the publicity." *AT&T*, 626 F. Supp. 3d at 743. Despite that statute "draw[ing] explicit content lines[,]" courts have not "resorted to strict scrutiny." *Id.*

13

"The principal inquiry in determining content neutrality . . . is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). A law is not content-based, even if it "require[s] some evaluation of the speech," if it does not "single out any topic or subject matter for differential treatment." *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 71–72 (2022). Regulation can be "content-neutral . . . even though," to know if it applies, "an observer ha[s] to ask who [i]s speaking and what the speaker [i]s saying[.]" *StreetMediaGroup, LLC v. Stockinger*, 79 F.4th 1243, 1251 (10th Cir. 2023). Nor are laws content- or viewpoint-based if they are triggered by the relationship between a speaker's message and that of another party without regard to the substantive message of either. *See Patriotic Veterans, Inc. v. Zoeller*, 845 F.3d 303, 305 (7th Cir. 2017) (upholding a statute as non-content based that "disfavor[ed] cold calls (that is, calls to strangers)" where "the nature of the message is irrelevant"). On that score, Glass engages in a sleight of hand by saying the Act imposes "sanctions for expressing anti-management views." Dkt. 24 at 18. The Act does not target speech about the subject of "management"; it simply requires disclosures in some scenarios where a proxy advisor recommends voting a different way on a proxy proposal than a company's management does, regardless of the topic of the proposal.

Here, the Disclosure Requirements do not target any particular topic, idea, or message. Indeed, they are facially neutral as to content and viewpoint. *See* H.B. 1273 §§ 1-11(a)(1)–(3). To be sure, the Disclosure Requirements apply when paid proxy advisors recommend voting against management, but not when they recommend voting in line with management. *Id.* But this is not content or viewpoint discrimination because the "substantive message itself is irrelevant to the application of the provisions." *City of Austin*, 596 U.S. at 71–72. Thus, a proxy advisor's recommendation to vote based on DEI considerations would trigger the Disclosure Requirements

14

if management recommends against it, but a proxy advisor's recommendation against DEI would also trigger the Disclosure Requirements if management recommends voting for it. Indeed, Glass's characterization of its own services as not skewing in favor of any ideology underscores that H.B. 1273 is not motivated by the State's opposition to any particular viewpoint. Glass states that its services are tailored to meet clients' "different views": "Some have adopted policies skeptical of ESG-related considerations; others treat climate-related risks as material to long-term value; still others adopt faith-based policies reflecting Catholic social teaching." Dkt. 24 at 23 (citing Dkt. 23-2, ¶¶ 26, 29).

Glass, striving to show that H.B. 1273 is somehow viewpoint-based, falls back on speculation about legislators' motives. There are manifold problems with this line of argument.

For one, Glass handpicks remarks from those supposedly involved in drafting the legislation and attempts to impute motives to the entire General Assembly based on these remarks. This is improper and should be disregarded. Per Indiana law, "the motive of individual sponsors of legislation cannot be imputed to the general assembly unless there is a basis for it in its statutory expression." Ind. Code § 2-5-1.1-17. Statements from legislative hearings and debates may not be "used as evidence of the legislative intent, purpose, or meaning of an act enacted or resolution adopted by the general assembly." Ind. Code § 2-5-1.1-16; *see McNeil v. Anonymous Hosp.*, 219 N.E.3d 789, 799 (Ind. Ct. App. 2023), *transfer denied mem.*, 250 N.E.3d 1051 (Ind. 2025).

In any event, even if it could be considered, the legislative history does not support Glass's theory that the Act was targeted at ESG-based advice. Glass argues that the "model statute" on which H.B. 1273 is based was drafted by an organization that states on its website that one of the group's goals is to "protect[] Americans" from "ESG in all its forms." Dkt. 24 at 10 (quoting Dkts. 23-22, 23-23). But this quotation is *not* from the model law itself (and certainly not from

15

H.B. 1273). Furthermore, even if the motives of a non-legislator could be imputed to the General Assembly, nothing in H.B. 1273 reflects targeting of ESG-related proxy advice. A law is not viewpoint discrimination "simply because its enactment was motivated by the conduct of the partisans on one side of a debate." *Hill v. Colorado*, 530 U.S. 703, 724 (2000). Similarly, that a law's effects "may fall more heavily on groups with one particular viewpoint does not transform a facially neutral statute into a [viewpoint] discriminatory one." *Wis. Educ. Ass'n Council v. Walker*, 705 F.3d 640, 650 (7th Cir. 2013). And a key legislative sponsor expressly disclaimed any intent to target ESG-based proxy advice. *See* Dkt. 35-7 at 42 (Freudenberg Decl. Ex. G (2/11/2026 Hr'g Tr. at 41:18–23 (statement of Rep. K. Pierce)) ("[I]t's not just ESG. Just because the example was used of ESG, that doesn't mean that implies the … entire thing is.")). The same lawmaker touted the Act as reflecting bipartisan agreement that some regulation of proxy advisors is warranted. *See* Dkt. 35-8 at 6–10 (Freudenberg Decl. Ex. H (Tr. of 1/13/26 Hearing on H.B. 1273 before H. Fin. Insts. Comm., 124th Gen. Assemb. (Ind.) at 5–6, 7:19–8:14) (statements of Rep. K. Pierce)). Glass cites no statements from legislative history that suggest otherwise.

> **3.** **The Act is constitutional under *Zauderer* because it is reasonably related to the State's interests, including in preventing consumer deception.**

Because *Zauderer* applies, the test of the Act's constitutionality is whether it is "reasonably related to the State's interest[s] in preventing deception of consumers," *see Zauderer*, 471 U.S. at 651, and "promoting the free flow of commercial information," *see Chamber of Com.*, 85 F.4th at 771. H.B. 1273 is reasonably related to attaining these goals. The Act reflects legitimate concerns that (1) proxy advisors are being misleading in describing their services as maximizing shareholder value; (2) investment managers are trying to fulfill fiduciary duties to retail investors by following proxy advisors' recommendations, but those recommendations are often not in retail investors'

16

financial interests; and (3) the proxy-advice industry is highly concentrated. *See, e.g.*, Dkt. 35-8 at 13–15 (Freudenberg Decl. Ex. H (1/13/2026 Hr'g Tr. at 12:13–14:25) (statement of M. du Mee)).

Many proxy advisory firms—including Glass—hold themselves out as maximizers of "shareholder value." For example, Glass publicly claims that "[t]he purpose of [its] proxy research and advice is to facilitate shareholder voting in favor of governance structures that will drive performance, create shareholder value and maintain a proper tone at the top." Dkt. 35-9 at 10 (Freudenberg Decl. Ex. I at 9). If proxy advisors are making recommendations not based on value-maximizing criteria, there is a real risk that their clients (or the retail investors who rely on those clients) will be misled by such claims. The Disclosure Requirements reasonably address these problems.

Glass argues that there is no need for the Act because Glass "serves highly sophisticated institutional investors." Dkt. 24 at 26. But not every institutional client is satisfied with its advisor's services. For example, JP Morgan recently eliminated use of proxy advisors. *See* Dkt. 35-10 at 4 (Freudenberg Decl. Ex. J). As another example, BlackRock, the world's largest asset manager, has argued for disclosure rules: "Proxy advisors play an important role in the corporate governance ecosystem; however, we think that some improvements to transparency would benefit all stakeholders," including as to advisors' "methodology for their analyses and vote recommendations . . . ." Dkt. 35-11 at 3 (Freudenberg Decl. Ex. K at 2). This is precisely what H.B. 1273 is designed to do.

And these concerns are not limited to institutional investors. They are also shared by the retail investors on whose behalf those institutions act. For example, research shows that retail investors are concerned about transparency in proxy advisors' recommendations. *See* Dkt. 35-12 at 7–8, 13 (Freudenberg Decl. Ex. L at 6–7, 12).

17

Moreover, the need for oversight of proxy advisors is heightened by extreme concentration in the industry. As previously mentioned, Glass and ISS control around 90% of the market. "[T]he premise of the consumer protection laws" is "that the reality of an imperfect market allows numerous consumer depredations." *Brooks v. Chi. Downs Ass'n, Inc.*, 791 F.2d 512, 518 (7th Cir. 1986).

Relatedly, determining whether proxy advisors' recommendations create or destroy shareholder value is "difficult." Asaf Eckstein, *Skin in the Game for Credit Rating Agencies and Proxy Advisors: Reality Meets Theory*, 7 Harv. Bus. L. Rev. 221, 257 n.164 (2017) (quoting Yonca Ertimur et al., *Shareholder Votes and Proxy Advisors: Evidence from Say on Pay*, 51 J. Acct. Res. 951, 955 (2013)). Still, there is substantial evidence that "proxy advisor recommendations by ISS and Glass Lewis deplet[e] shareholder value." Dkt. 35-13 at 3 (Freudenberg Decl. Ex. M at 2). H.B. 1273 aims to address this imperfect-information problem by calling for upfront transparency about advisors' recommendations.

Glass's complaint that H.B. 1273 was not driven by a "specific company in Indiana." Dkt. 24 at 25 (quoting Dkt. 23-25 at 7:19–8:14), is irrelevant. The *Zauderer* standard does not require policymakers to prove that a particular form of wrongdoing has occurred in a given state before they can impose a disclosure requirement. A legislature need only conclude that "warning[s] or disclaimer[s] might be appropriately required . . . in order to dissipate the *possibility* of consumer confusion or deception." *Zauderer*, 471 U.S. at 651 (emphasis added) (quoting *In re R. M. J.*, 455 U.S. 191, 201 (1982)). As discussed above, the harms addressed by H.B. 1273 are, at the very least, "potentially real [and] not purely hypothetical," which is sufficient. *See Chamber of Com.*, 85 F.4th at 771 (quoting *NIFLA*, 585 U.S. at 776).

18

At any rate, Glass's second-guessing of the sources on which the legislature relied is inappropriate. The First Amendment "does not demand evidence or empirical data to demonstrate the rationality of mandated disclosures in the commercial context." *Conn. Bar Ass'n v. United States*, 620 F.3d 81, 97–98 (2d Cir. 2010) (cleaned up). Even when intermediate scrutiny applies to commercial speech, a state is not required to produce "empirical data . . . accompanied by a surfeit of background information." *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 628 (1995). A state may "justify speech restrictions by reference to studies and anecdotes pertaining to different locales altogether, or even . . . history, consensus, and simple common sense." *Id.* (cleaned up).

And Glass cannot defeat the Disclosure Requirements by indicting the legislature for supposedly failing to consider "more benign and narrowly tailored options" as alternatives to the Act, including "a public information campaign, Indiana's own counter-speech, or a viewpoint-neutral law against materially deceptive proxy advice generally." Dkt. 24 at 19 (cleaned up). This argument fails, for one, because it is "not . . . appropriate to strike down [disclosure] requirements merely because other possible means by which the State might achieve its purposes can be hypothesized." *Zauderer*, 471 U.S. at 651 n.14. Regardless, neither of Glass's hypothesized alternate policies is a substitute for H.B. 1273. A mere "public information campaign" would not solve the problems that motivated H.B. 1273, because it would not empower shareholders to determine whether a given proxy recommendation was formulated in accordance with appropriate principles. Indiana's "counter-speech" also would do little, since the State does not automatically have access to proxy advisors' recommendations at the time they are made and therefore cannot preemptively notify the public when the recommendations are not based on financial analysis. Likewise, reliance on a general legal prohibition of "decept[ion]" is no substitute for legislation like the Act. If general anti-fraud laws were enough to render commercial disclosure requirements

19

unconstitutional, the requirements upheld in legions of cases, including *Zauderer*, would have been struck down—since regulated parties were already subject to the same fraud liability. A state may use disclosures to ensure that consumers are fully informed about a product or service; lawmakers need not rely solely on post-hoc fraud liability to deter misleading commercial speech. *See Pub. Citizen, Inc. v. Pinellas County*, 321 F. Supp. 2d 1275, 1304 (M.D. Fla. 2004).

Finally, Glass attacks the Act as underinclusive. *See* Dkt. 24 at 19–20. But the Supreme Court has held that "a disclosure requirement" is not "subject to attack" simply because "it is 'under-inclusive.'" *Zauderer*, 471 U.S. at 651 n.14.

### 4.    In the alternative, the Act satisfies exacting scrutiny.

But the Disclosure Requirements would be constitutional even if *Zauderer* did not apply. Where a State requires factual disclosures outside the commercial realm, the proper framework is "exacting scrutiny," which "requires that there be a substantial relation between the disclosure requirement and a sufficiently important governmental interest, and that the disclosure requirement be narrowly tailored to the interest it promotes." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 611 (2021) (cleaned up). The narrow-tailoring principle "require[s] a fit that is not necessarily perfect, but reasonable." *Id.* at 609 (quoting *McCutcheon v. FEC*, 572 U.S. 185, 218 (2014)). This sort of "[i]ntermediate scrutiny is not an overly demanding standard, as it does not require a perfect or least restrictive fit." *GEFT Outdoor, LLC v. City of Westfield*, 39 F.4th 821, 825 (7th Cir. 2022).

The Supreme Court's decision *Meese v. Keene* is instructive. 481 U.S. 465 (1987). The Court upheld a law requiring distributors of films on behalf of foreign governments to provide film recipients with a roughly 70-word disclosure explaining that the films were distributed by an agent of a foreign power, even though the statute was not a regulation of "commercial speech" and the films were themselves protected speech. *Id.* at 471. The Court reasoned that Congress did not restrict speech but rather "simply required the disseminators of such material to make additional

20

disclosures that would better enable the public to evaluate the import of the propaganda." *Id.* at 480. The disclosure that H.B. 1273 requires from proxy advisors is just as minor of an inconvenience—and just as useful a way of "better enabl[ing] the public to evaluate the import of" proxy advice. *See also AT&T*, 626 F. Supp. 3d at 750–54 (upholding under exacting/intermediate scrutiny SEC rule requiring stock issuers to publicly disclose certain material nonpublic information).

Here, the Disclosure Requirements substantially advance various important State interests that have been spelled out in the preceding pages, including preventing deception and keeping consumers and retail investors informed about proxy advisors' services. Moreover, the Act's requirements are appropriately tailored to the State's interests; the limits on the Act's reach are not based on hostility to certain viewpoints but rather reflect a legislative determination of where the risk of harm is greatest. The alternative policies dreamed up by Glass that supposedly could better achieve the State's aims are, as already discussed, inadequate substitutes for H.B. 1273.

Indeed, while Glass complains that H.B. 1273 is not the least restrictive means of achieving the State's interests, "least-restrictive-means" is not the applicable standard. *See Ams. for Prosperity*, 594 U.S. at 609–11; *GEFT Outdoor*, 39 F.4th at 825. Further, "[t]he Supreme Court has repeatedly emphasized that 'disclosure' *is* the 'less restrictive alternative' to combat misleading speech." *Nat'l Ass'n of Broadcasters v. FCC*, 147 F.4th 978, 1005 (D.C. Cir. 2025) (emphasis added) (quoting *Citizens United v. FEC*, 558 U.S. 310, 369 (2010)). Accordingly, even if this Court finds the regulated speech is not commercial, the Disclosure Requirements are valid.

**B.    Glass is unlikely to prevail on its claim that the Act is void for vagueness.**

Glass is unlikely to succeed on its claim that the Disclosure Requirements are unconstitutionally vague under the Due Process Clause. Dkt. 24 at 26–29. The Act is not yet effective and has not been applied to Glass. This is thus a pre-enforcement facial challenge, which

21

is "highly disfavored." *See Parents Protecting Our Child., UA v. Eau Claire Area Sch. Dist.*, 95 F.4th 501, 506 (7th Cir.), *cert. denied,* 145 S. Ct. 14 (2024). A federal court "will not hold a vague statute unconstitutional if a reasonable interpretation by a state court could render it constitutional in some application." *Gresham v. Peterson*, 225 F.3d 899, 908 (7th Cir. 2000).

### 1.    The Act has an ascertainable core of meaning.

Glass speculates about potential uncertainties regarding how the Act may apply. *See* Dkt. 24 at 26–29. But due process does not demand "perfect clarity and precise guidance . . . even of regulations that restrict expressive activity." *Ward*, 491 U.S. at 794. "Some uncertainty at the margins does not condemn a statute." *Trs. of Ind. Univ. v. Curry*, 918 F.3d 537, 540 (7th Cir. 2019). Even "when a law regulates speech," it is enough that it has "an ascertainable core of meaning." *Smiley v. Jenner*, 173 F.4th 865, 871–72 (7th Cir. 2026). "[T]he bar for facially invalidating a statute on vagueness grounds is very high, especially for civil statutes." *Id.* at 874. The Act is a civil statute. *See* Ind. Code § 24-5-0.5-4(c). It also includes a scienter requirement, which "mitigate[s] a law's vagueness." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498–99 (1982). *See* Ind. Code § 24-5-0.5-4(d) (regulated party is not liable for "bona fide error"); *id.* § 24-5-0.5-3(e) (providing for a "good faith" defense); *id.* § 24-5-0.5-4(g) (for any civil penalty to be assessed, a court must find a "person has knowingly violated" the Act). And "economic regulation is subject to a less strict vagueness test[.]" *Hoffman Ests.*, 455 U.S. at 498.

The Disclosure Requirements here have "an ascertainable core of meaning." *Smiley*, 173 F.4th at 872. A proxy advisor that charges for its service must make certain disclosures if it makes certain kinds of recommendations to Hoosiers or in connection with Indiana businesses. Specifically, if the advisor makes a recommendation against entity management on an entity proposal or proxy proposal, or makes a default recommendation or policy concerning votes against entity management on entity or proxy proposals, and the proxy advisor does not do so based on a

22

"written financial analysis," the proxy advisor disclose that fact to all interest holders (and those acting on interest holders' behalf) and on the advisor's website. *See* H.B. 1273 § 1-11; *see also id.* § 1-8(a). "Written financial analysis" is defined in detail by the Act. *See id.* § 1-10.

But H.B. 1273's detailed definition of "written financial analysis" does not deter Glass from claiming not to understand it. First, Glass says, the phrase "short term and long term financial benefits and costs" is unconstitutionally vague because the Act does not specify exact time horizons for short- and long-term. Dkt. No. 24 at 28 (quoting H.B. 1273 § 1-10). But there is no "doubt [of] the constitutionality of laws that call for the application of a qualitative standard such as 'substantial risk' to real-world conduct . . . ." *Johnson v. United States*, 576 U.S. 591, 604 (2015). Accordingly, numerous courts, including the Seventh Circuit, have rejected vagueness challenges to laws that establish inexact timeframes (e.g., "reasonable period"). *See, e.g.*, *Vrljicak v. Holder*, 700 F.3d 1060, 1061–62 (7th Cir. 2012); *Rimmer v. Colt Indus. Operating Corp.*, 656 F.2d 323, 330 (8th Cir. 1981); *NLRB v. Loc. 239, Int'l Bhd. of Teamsters*, 289 F.2d 41, 44–45 (2d Cir. 1961). "[J]ust because it is *possible*" sometimes "to replace a standard with a numeric rule, the Constitution does not render the standard a forbidden choice." *Vrljicak*, 700 F.3d at 1062. The Act simply exhorts proxy advisors to account for factors that "continu[e] to exist or have an effect for a long time into the future," *Long-term*, Cambridge Business English Dictionary (2011), plus those that "continu[e] or having an effect for a short period of time," *Short-term*, *id.* This is sufficient guidance to enable good-faith compliance.

Further undermining Plaintiff's argument on this point is the fact that H.B. 1273's "phrase[s]"—"short-" and "long-term"—"ha[ve] also been used for many years as a criterion in a variety of other statutes," apparently without controversy over their clarity. *See Jordan v. De George*, 341 U.S. 223, 230 (1951). H.B. 1273 mirrors a "standard" provision of state corporation

23

laws, Corporate Acquisitions § 8:55 (2026), in Indiana and dozens of other states that set forth the fiduciary duties of corporate directors, who "may . . . consider both the short term and long term best interests of the corporation" and "shareholders." Ind. Code § 23-1-35-1(g). Glass, with its claimed wealth of expertise, may look to industry practice and caselaw to clarify these terms. Moreover, Glass need not worry about the exact line between short and long term, since the Act calls for analysis of both; it is sufficient for its "financial analysis" to address the relevant interests over a broad timeframe. *Cf. Paramount Commc'ns, Inc. v. Time Inc.*, 571 A.2d 1140, 1150 (Del. 1989) (noting that often "the question of 'long-term' versus 'short-term' values is largely irrelevant because directors, generally, are obliged to chart a course for a corporation which is in its best interests without regard to a fixed investment horizon"). "[S]hort-" and "long-term" have "meaning[s] well enough defined to enable one engaged in the trade to correctly apply [them], at least as a general thing." *See Hygrade Provision Co. v. Sherman*, 266 U.S. 497, 502 (1925).

Glass further objects that the Act "does not define . . . 'interest holder value.'" Dkt. No. 24 at 28. But "[a] statute need not define every term to survive a vagueness challenge." *Brown v. Chi. Bd. of Educ.*, 824 F.3d 713, 717 (7th Cir. 2016). Regardless, the Act does define "interest": "a share in a business corporation" or "a governance interest or economic interest in any other type of unincorporated entity." H.B. 1273 § 1-5. Insofar as proxy advisors are giving recommendations vis-à-vis business corporations (as usually will be the case), "interest" means "share," and therefore "interest holder value" means "shareholder value"—a widely understood phrase. And for all "interests" covered by the Act, the "financial analysis" is analysis of an interest's *economic* value. This much is clear from context—namely, the fact that the operative term being defined is "written *financial* analysis." *See Hinshaw v. Bd. of Comm'rs of Jay Cnty.*, 611 N.E.2d 637, 639 (Ind. 1993) (court must interpret a statute "as an entirety"). Even without this context, "value"

24

typically means "the monetary worth or price of something; the amount of goods, services, or money that something commands in an exchange." *Value*, Black's Law Dictionary (12th ed. 2024). Numerous courts, too, have rejected arguments that the term "value" is unconstitutionally vague. *See, e.g.*, *United States v. Cook*, 782 F.3d 983, 989 (8th Cir. 2015); *United States v. Pommerening*, 500 F.2d 92, 97 (10th Cir. 1974); *People v. Becker*, 759 P.2d 26, 32 (Colo. 1988).

Glass complains, too, that the Act does not give an exact deadline for what constitutes a "reasonable time" within which to make any "written financial analysis" available upon request. Dkt. No. 24 at 28. But "protean words such as 'reasonable' are ubiquitous in law." *Vrljicak*, 700 F.3d at 1062. They do not make a law intolerably vague, or else "the entire common law is unconstitutional because . . . all laws calling for 'reasonable' behavior in one or another fashion are forbidden." *K-S Pharmacies, Inc. v. Am. Home Prods. Corp.*, 962 F.2d 728, 732 (7th Cir. 1992). "[W]hat is a 'reasonable time'" in a given case depends "on its own facts and circumstances." *Gen. Grain, Inc. v. Goodrich*, 233 N.E.2d 187, 189 (Ind. Ct. App. 1968). Indeed, Indiana tort law imposes duties to act within a "reasonable time" in many scenarios. *See, e.g.*, *Orth v. Smedley*, 378 N.E.2d 20, 23 (Ind. Ct. App. 1978); *City of Indianapolis v. Falvey*, 296 N.E.2d 896, 901 (Ind. Ct. App. 1973); *Baker v. Fenneman & Brown Props., LLC*, 793 N.E.2d 1203, 1210 (Ind. Ct. App. 2003).

Glass also argues that the "[t]he phrase 'default recommendation or policy'" is ambiguous. Dkt. 24 at 27 (quoting H.B. 1273 § 1). But that phrase is well defined in the Act, and there is nothing ambiguous as applied to Glass. Indeed, the term "default recommendation or policy" likely covers the various policies mentioned by Glass, and "breadth should not necessarily be confused for vagueness," *Wiemerslage v. Maine Twp. High Sch. Dist. 207*, 29 F.3d 1149, 1151 (7th Cir. 1994). Still, Glass attempts to give an example to illustrate how the definition is unclear: "Glass

Lewis will no longer provide a single Benchmark Policy recommendation" but "instead offer multiple research perspectives. Whether each of those research perspectives is itself a 'default recommendation or policy' subject to the Act's trigger is not answerable from the statutory text." Dkt. 24 at 27. But this problem is illusory: the Disclosure Requirements apply when an advisor, without conducting "financial analysis," *either* "makes a recommendation" to vote against management on a proxy vote *or* "makes a default recommendation or policy concerning votes against entity management." H.B. 1273 § 1-11(a). Glass's upcoming policy change will result it in making either ordinary "recommendations" or "default recommendations." Either way, it is subject to the Disclosure Requirements.

Glass also protests the Act's definition of "proxy advisory service." Dkt. 24 at 27. But Glass fails to identify how that definition renders vague the application of the Act to Glass. The Act defines "proxy advisory service" broadly, H.B. 1273 § 1-8(a), and Glass's asserted inability to distinguish "development" from "service" is irrelevant to determining if the Act applies. Glass's services are "proxy advisory service" if they meet *any* of the three criteria set forth in the definition.

Relatedly, Glass argues that the Act is unconstitutionally vague because "Sections 11 and 12 each refer to violations under 'section 8(1)' and 'section 8(2)'—but no such subdivisions exist." Dkt. 24 at 28. To be sure, the Act does not contain a section "8(1)" or "8(2)." But this is a scrivener's error that does not render the Act vague. The Act contains a Section 8, which consists of two subsections, (a) and (b). Section 8, subsection (a) has three numbered subparts, while Section 8, subsection (b) has two. Section 8(a) and its subparts explicitly set forth the three criteria defining "proxy advisory service," whereas 8(b) and its subparts address the totally unrelated issue of charitable organizations exempt from the Act. Thus, when one reads § 1-11(a)(2), § 1-11(b)(3), or § 1-12(a), which all use the phrase "proxy advisory services described in section 8(1) or 8(2),"

26

it is clear that this refers to Sections 8(a)(1) or 8(a)(2), because those are the only numbered parts of Section 8 that "describe[]" proxy advisory service. "Where the legislature's intent is manifest from the statutory context, . . . despite the presence of clerical or typographical errors, . . . the constitutional vice of vagueness is absent." *LaBauve v. La. Wildlife & Fisheries Comm'n*, 444 F. Supp. 1370, 1380 (E.D. La. 1978). A trivial scrivener's error of this sort does not render a statute void for vagueness. *See, e.g.*, *Bamboo Bros. v. Carpenter*, 183 Cal. Rptr. 748, 754 n.10 (Ct. App. 1982); *United States v. Barona*, 59 F.3d 176 (Table), 1995 WL 365461, at *11 (9th Cir. 1995).

Glass's assertion that act is vague regarding its "geographic scope," Dkt. 24 at 27, also fails. The Act is limited to proxy service advice provided to Hoosiers or about Indiana businesses. H.B. 1273 § 1-8(a)). "When there is a straightforward, parallel construction that involves all nouns or verbs in a series, a prepositive or postpositive modifier"—which include a prepositional phrase—"normally applies to the entire series." *Alexander v. Linkmeyer Dev. II, LLC*, 119 N.E.3d 603, 616 n.8 (Ind. Ct. App. 2019) (quoting Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* § 19 (2012)). Thus, in the Act, the modifier "in Indiana" modifies *both* "person" *and* "entity." H.B. 1273 § 1-8(a)).

Lastly, Glass complains that "[t]he Act does not say what counts as a 'clear and conspicuous disclosure'" or "how 'prominently' the homepage display must appear." Dkt. 24 at 28. But "'conspicuous' is a term found in many statutory requirements," such as those "specifying that a notice . . . be posted in a conspicuous place. Statutes using the term 'conspicuous' are not lightly to be stricken down for vagueness." *N.Y. Horse & Carriage Ass'n v. City of New York*, 545 N.Y.S.2d 439, 441 (N.Y. Sup. Ct. 1989); *accord Ford Dealers Ass'n v. Dep't of Motor Vehicles*, 650 P.2d 328, 341 (Cal. 1982); *Bantam Books, Inc. v. FTC*, 275 F.2d 680, 683 (2d Cir. 1960). "Prominent," which is synonymous with "conspicuous" in this context, means "readily noticeable:

27

CONSPICUOUS." *Prominent, Merriam-Webster.com Dictionary,* Merriam-Webster, https://www.merriam-webster.com/dictionary/prominent (last visited May 27, 2026). Neither word renders a law void for vagueness. To quote a court that rejected a vagueness attack on a statute's use of "conspicuously" *and* "prominent," "[c]ommon sense dictates that 'conspicuously display[]' on a 'prominent part of the . . . materials' means to place the mandated statement *where the reader will see it*. People of ordinary intelligence do not need to be told what size type must be used or where the statement must be placed in order to ensure that a reader will see the statement." *State ex rel. Hechler v. Christian Action Network*, 491 S.E.2d 618, 631–32 (W. Va. 1997).

### 2.    Glass fails to demonstrate that the Act will be arbitrarily enforced.

Glass argues that the Act is also void for vagueness because Defendant may take advantage of its alleged vagueness to selectively enforce the legislation. Dkt. 24 at 28–29. This is merely a repackaging of Glass's meritless argument that the Act is too vague to give fair notice of how to comply. Here, "the core meaning" clearly ascertainable from the Act's challenged provisions "makes arbitrary or discriminatory enforcement unlikely." *Smiley*, 173 F.4th at 875. "If that proves inaccurate," Glass "may bring an as-applied challenge." *See id.* at 876. In the meantime, a court should not "deem [a] law vague by identifying situations in which state officials *might* take an untenably broad reading of the [statutory language], and then predicting that they *will* do so." *Bauer v. Shepard*, 620 F.3d 704, 716 (7th Cir. 2010).

Moreover, Glass's personal attacks on the Attorney General are baseless and irrelevant. Glass's claimed evidence of his "willingness to arbitrarily enforce the Act against views he dislikes"—"an Advisory Opinion declaring ESG off-limits to state pension managers, multi-state demand letters to Glass Lewis, and litigation against investment managers," Dkt. 24 at 29—is in reality nothing more than evidence of the State's emphasis on legitimate investment criteria and stewardship of public expenditures.

28

In attacking the Attorney General, Glass makes another offhanded argument for why the Act is allegedly too vague: it imposes "civil penalties of up to $5,000 per violation, with no definition of what counts as a single violation." Dkt. 24 at 29. But this "per violation" language has been part of Indiana law for decades, *see* Ind. Code § 24-5-0.5-4(g) (1989), and Indiana courts provide an established framework for what constitutes a single "violation" of a prohibitory statute that does not define that term. *See, e.g.*, *Powell v. State*, 151 N.E.3d 256, 26–69 (Ind. 2020); *Am. Film Distribs., Inc. v. State*, 471 N.E.2d 3, 5 (Ind. Ct. App. 1984). Glass's vagueness challenge to the Act's "per violation" language thus fails.

Furthermore, a vagueness challenge based on feared arbitrary or discriminatory enforcement requires the challenger to show that "*inherently vague statutory language* permits . . . selective law enforcement . . . ." *Smith v. Goguen*, 415 U.S. 566, 576 (1974) (emphasis added). Glass cannot carry its burden here, because the Act's language is not "inherently vague."

## II.    The Balance of Equities and Public Interest Weigh Against An Injunction.

The balance of equities and public interest—which merge where the State is the defendant, *Nken v. Holder*, 556 U.S. 418, 435 (2009)—favor the State. This Court must balance "the irreparable harm the moving party will endure if the preliminary injunction is wrongfully denied versus the irreparable harm to the nonmoving party if it is wrongfully granted." *K.C. v. Individual Members of Med. Licensing Bd. of Ind.*, 121 F.4th 604, 632 (7th Cir. 2024) (citation omitted), *reh'g denied,* No. 23-2366, 2025 WL 848427 (7th Cir. Mar. 18, 2025). Glass's cursory argument on this point is insufficient to carry its burden, *see* Dkt. 24 at 31, and it claims likely fail on the merits. Meanwhile, "[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *See Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (cleaned up).

29

**III.    In the Alternative, the Act Is Severable and Any Injunction Should Be Limited.**

If the Court finds that any particular provision of the Act is unconstitutional and warrants an injunction, the Act's other provision should be unaffected. "Severability is . . . a matter of state law." *Leavitt v. Jane L.*, 518 U.S. 137, 139 (1996) (per curiam). Indiana law provides a "firewall" against unconstitutional provisions, such that the "'the invalidity [of one provision] does not affect other provisions that can be given effect without the invalid provision or application.'" *LSP Transmission Holdings II, LLC v. Huston*, 131 F.4th 566, 579 (7th Cir. 2025) (quoting Ind. Code § 1-1-1-8(a)). Because the Act here does not contain a nonseverability provision, "the presumption is that [any] invalid provision . . . is severable from the remainder of the statute." *City of Hammond v. Herman & Kittle Props., Inc.*, 119 N.E.3d 70, 88 (Ind. 2019).

It is Glass's burden "to show that the whole statute must be stricken." *Id.* But Glass does not address this issue at all. Even if it did, Glass could not carry its burden to render invalid the entirety of H.B. 1273. Glass's challenge is focused on the three Disclosure Requirements, which are not "inseparably connected": for example, the Client Disclosure is not dependent on the Website Disclosure. *See City of Hammond*, 119 N.E.3d at 88 (quoting Ind. Code § 1-1-1-8(b)). Further, Glass does not specifically challenge the remainder of the Act—in particular Sections 2, 3, and 4, which amend the existing Indiana Code. *See* H.B. 1273 §§ 2–4. Severability is therefore warranted for those provisions, which are intended to work independently of the Disclosure Requirements. *Cf. LSP Transmission*, 131 F.4th at 579; *GEFT Outdoor, L.L.C. v. City of Westfield*, 491 F. Supp. 3d 387, 408 (S.D. Ind. 2020).

**CONCLUSION**

Because the Act lawfully regulates Glass's provision of proxy advisory services to Hoosiers, Glass's motion for preliminary injunction should be denied.

30

Dated: May 28, 2026

Respectfully submitted,

THEODORE E. ROKITA
Indiana Attorney General

By:    James A. Barta
Solicitor General
John P. Lowrey
Deputy Solicitor General
OFFICE OF THE ATTORNEY GENERAL
302 W. Washington Street
IGCS 5th Floor
Indianapolis, IN 46204-2770
Telephone: (317) 232-0709
Facsimile: (317) 232-7979
James.Barta@atg.in.gov
John.Lowrey@atg.in.gov

*/s/ H. Christopher Bartolomucci*
Gene C. Schaerr
H. Christopher Bartolomucci
Stephanie L. Freudenberg
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
Telephone: (202) 787-1060
gschaerr@schaerr-jaffe.com
cbartolomucci@schaerr-jaffe.com
sfreudenberg@schaerr-jaffe.com

*Counsel for Defendant*

31