UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

INSTITUTIONAL SHAREHOLDER SERVICES )
INC., )
                                    )
                       Plaintiff, )
                                    )
                 v. )             No. 1:26-cv-00717-MPB-MKK
                                    )
TODD ROKITA in his official capacity as the )
Indiana Attorney General, )
                                    )
                   Defendant. )

GLASS, LEWIS & CO., LLC, )
                                    )
                       Plaintiff, )
                                    )
                 v. )             No. 1:26-cv-00862-MPB-MKK
                                    )
TODD ROKITA, in his official capacity as the )
Attorney General of the State of Indiana, )
                                    )
                   Defendant. )

## ORDER GRANTING PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION

      Plaintiffs Institutional Shareholder Services Inc. ("ISS") and Glass, Lewis & Co., LLC

("Glass Lewis," and collectively "Plaintiffs") filed lawsuits against Indiana Attorney General

Todd Rokita ("Defendant") and ask this Court to enjoin Indiana H.B. 1273 from applying to their

businesses before the law goes into effect on July 1, 2026.[1] Plaintiffs are proxy advisory firms

that provide analysis and recommendations to institutional investors on upcoming shareholder

ballot items. The challenged law imposes disclosure requirements on Plaintiffs if they provide

---

[1] Because Plaintiffs advance similar arguments, the Court addresses both Motions for Preliminary Injunction in one combined order. The Court will formally consolidate these two cases in a subsequent order. The Clerk of the Court is **DIRECTED** to docket a copy of this Order in *Glass, Lewis & Co., LLC v. Rokita*, No. 1:26-cv-862.

recommendations to their clients that go against a company management's preference, which Plaintiffs contend violates the First and Fourteenth Amendments. For the following reasons, both Motions for Preliminary Injunction, (Docket No. 26; *Glass, Lewis & Co., LLC v. Rokita*, No. 1:26-cv-862, at Docket No. 23), are **GRANTED**.

## I.    Background

### A.  ISS and Its Business

ISS "offers a suite of corporate governance and sustainable investment services" for institutional investors, including as a "proxy advisory service provider[.]" (Docket No. 26-2 at ECF p. 3). Publicly traded companies hold shareholder meetings that feature votes on corporate governance items. Rather than attending these meetings in person, most shareholders "exercise" their voting rights "through the use of proxy voting[.]" (*Id.*). These shareholder votes cover topics ranging from who will serve on the board of directors to potential mergers and acquisitions and can include voting items proposed by management and shareholders. (*See* Docket Nos. 30 at ECF p. 11; 26-2 at ECF p. 3).

Institutional investors "often vote on behalf of their clients" in these shareholder meetings. (Docket No. 26-2 at ECF p. 4). These investors are "sophisticated market participants" that manage investments for many investors, and the volume of investments that they oversee makes it "inefficient, costly, or impractical for institutional investors to perform research and analysis on each proposal presented" at shareholder meetings. (*Id.* at ECF p. 5). To counter this information problem, some institutional investors contract with proxy advisory firms, who, in exchange for fees, "aggregate[] companies' publicly available data and information, analyzes company proxy materials, . . . and provides voting recommendations" to its subscribing clients. (*Id.* at ECF pp. 5–6). In 2025, ISS assisted over 1,000 clients with analysis and recommendations

2

for over 50,000 shareholder meetings. (*Id.* at ECF p. 5). ISS's recommendations cover the gamut of items on shareholder meeting agendas and often run over fifty pages. (*See* Docket No. 26-3 at ECF pp. 380–438).

ISS's "objective" is to "help its clients make informed voting decisions in their own best interests" as defined by the clients. (Docket No. 26-2 at ECF p. 6). To that end, ISS offers different policy frameworks that institutional investors can choose from. (*Id.* at ECF p. 7). ISS thus "routinely offers different recommendations about the same vote" because the framework that clients choose may lead to recommendations both for and against a proposal. (*Id.*). ISS offers three kinds of voting policies that guide its recommendations: the Benchmark Policy, thematic Specialty Policies, and client-specific Custom Policies. (*Id.*).

The Benchmark Policy is "a market-specific proxy voting framework" that ISS developed and is based on the tenets of accountability, stewardship, independence, and transparency. (*Id.* at ECF p. 8). ISS forms this policy "through an annual review and development process" by collecting feedback from market participants. (*Id.* at ECF p. 9). The Benchmark Policy provides general recommendations on common shareholder vote items, such as the recommendation to "[v]ote case-by-case on management proposals on poison pill ratification," and to "vote against management and shareholder proposals to restrict or prohibit shareholders' ability to act by written consent[.]" (Docket No. 26-3 at ECF pp. 303, 305).

The Specialty Policies evaluate governance issues from seven specific perspectives, such as a Catholic Faith-Based policy, a Socially Responsible Investment policy, and a Climate policy. (Docket No. 26-2 at ECF p. 10). These policies provide coverage tailored to the perspectives and factors that ISS's clients view as material. (*Id.*). For example, the Catholic Faith-Based policy "generally takes as its frame of reference policies and proposals promulgated by the Catholic

Bishops' Pastoral on economics, the Socially Responsible Investment Guidelines adopted by the Bishops, and the policies developed by members of the Interfaith Center on Corporate Responsibility." (*Id.* at ECF pp. 10–11) (internal quotations omitted). This faith-based policy reflects the financial and social objectives that investors opting for this framework commonly share. (*Id.*; Docket No. 26-3 at ECF pp. 630–686).

Finally, ISS offers Custom Policies that are proprietary to and owned by its clients that incorporate the client's specific needs and "reflect their unique corporate governance and voting philosophies." (Docket No. 26-2 at ECF pp. 7–8). Many of ISS's clients opt for custom policies. (*Id.* at ECF p. 8).

Regardless of the policy selected by its client, ISS applies it to upcoming meeting items. (*Id.* at ECF p. 12). ISS looks at the proposals, pulls available data, and then analyzes each proposal "through the prism of the applicable policy to come up with a voting recommendation." (*Id.*). ISS has no financial interest in the outcome of the shareholder votes, and its clients are not bound by its recommendations. (*Id.*; Docket No. 30 at ECF p. 13). ISS allows companies that are the subject of ISS's recommendations to obtain complimentary access to its Benchmark Policy, but Specialty and Custom policies remain proprietary to its clients. (Docket No. 26-2 at ECF p. 13).

### B. Glass Lewis and Its Business

Like ISS, Glass Lewis is "a proxy advisor" that provides "institutional investors with independent research, data analytics, and voting recommendations . . . on company ballot items." (*Glass, Lewis & Co., LLC v. Rokita*, No. 1:26-cv- 862, Docket No. 23-2 at ECF pp. 1–2).[2] The reports Glass Lewis compiles feature "detailed analysis and dense tables of quantitative and

---

[2] Citations to the docket in the *Glass, Lewis & Co., LLC v. Rokita* case will be denoted by "GL."

qualitative information" about all the items in an upcoming shareholder vote and often run between thirty and seventy pages. *(Id.* at ECF p. 3; *see, e.g.*, GL Docket No. 23-7). For some issues, such as whether a nominee should be elected to the board of directors, Glass Lewis's recommendations consider qualitative features, including "weighing the directors' experience, current commitments, and governance impacts." (GL Docket No. 23-2 at ECF p. 4).

Glass Lewis's proxy advisory services help its clients "cast informed votes on company ballot items" in keeping with a client's fiduciary duty to its retail investors. (*Id.* at ECF p. 2). Glass Lewis offers different policy frameworks that institutional investors can choose from. (*Id.* at ECF p. 6). Most Glass Lewis clients "receive recommendations pursuant to a custom policy." (*Id.*). These clients provide Glass Lewis with detailed guidance "that reflect[s] the client's fiduciary obligations, investment strategies, risk tolerances, and ideological preferences." (*Id.*). Glass Lewis also offers "thematic voting policies," such as a Catholic Policy "that reflects the unique fiduciary responsibility of Catholic institutions and that is informed by the voting guidelines of the Conference of Catholic Bishops." (*Id.*). Glass Lewis also has a Climate Policy and a Corporate Governance Focused Policy. (*Id.* at ECF pp. 6–7).

Regardless of the chosen policy, Glass Lewis, like ISS, applies the policy that its client selects to the upcoming shareholder meeting resolutions and generates recommendations tailored to the client's preferences. (*Id.* at ECF p. 6). Because clients can "hold sharply different views about what serves their financial interests," Glass Lewis may recommend both for and against a shareholder proposal depending on the client. (*Id.* at ECF pp. 5–6). Glass Lewis's clients are not bound by its recommendations. (*Id.* at ECF p. 4).

### C. Indiana H.B. 1273

The Indiana General Assembly passed a bill creating a new chapter in the Indiana Code, effective July 1, 2026. (Docket No. 26-1 at ECF p. 2); Ind. Code § 24-4-27.5 *et seq.* H.B. 1273 imposes requirements on "proxy advisory service[s]," defined as services that are provided to individuals or entities in Indiana that include "[a]dvice or a recommendation on how to vote" in shareholder elections. (*Id.* at ECF p. 4). The bill is triggered only if a proxy advisor, "makes a recommendation against entity management on an entity proposal or proxy proposal[.]" (*Id.* at ECF pp. 4–7). If a proxy advisor's recommendation is based on a "written financial analysis," defined as "a written document" that "(1) analyzes the expected short term and long term financial benefits and costs" of the proposal; "(2) concludes what vote or course of action is most likely to positively affect interest holder value; and (3) explains the methods and processes used to prepare the analysis," then the proxy advisor must disclose to its client that it conducted a written financial analysis and make the analysis available upon request. (*Id.* at ECF pp. 4, 6). Proxy advisors must also make a copy of the written financial analysis available to the company management for whom the anti-management recommendation applies. (*Id.* at ECF pp. 6–7). If a proxy advisor recommends that its client vote against management's position and decides not to conduct a "written financial analysis," then it must "provide a clear and conspicuous disclosure" to its client, to company management, and on the home page of the advisor's website that the advisor's recommendation was made "against entity management . . . without utilizing a written financial analysis[.]" (*Id.* at ECF p. 5). Each violation of H.B. 1273 is deemed a deceptive act and carries penalties of $5,000 per violation. (*Id.* at ECF p. 7); Ind. Code § 24-5-0.5-4(g).

6

### D. Procedural History

ISS filed this action on April 13, 2026, (Docket No. 1), and moved for a Preliminary Injunction the following week, (Docket No. 26). Glass Lewis filed its action on April 30 and moved for a Preliminary Injunction shortly thereafter. (GL Docket Nos. 1; 23). Defendant opposed Plaintiffs' requests in both actions, (Docket No. 46; GL Docket No. 36), and the Court heard oral arguments on this matter on June 9, (Docket No. 51; GL Docket No. 40). Plaintiffs seek an injunction that prevents Defendant "from taking any action to enforce H.B. 1273" against them. (Docket No. 30 at ECF p. 38; *see* GL Docket No. 24 at ECF p. 31).

## II.    Legal Standard

"A preliminary injunction is an extraordinary equitable remedy that is available only when the movant shows clear need." *Turnell v. Centimark Corp.*, 796 F.3d 656, 661 (7th Cir. 2015). Plaintiffs, as the moving party, must establish that they are "likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020) (citation omitted). In First Amendment cases, such as this one, "the likelihood of success on the merits will often be the determinative factor." *Am. Civil Liberties Union of Ill. v. Alvarez*, 679 F.3d 583, 590 (7th Cir. 2012) (citation omitted).

## III.    Discussion

Plaintiffs assert that H.B. 1273 violates the First Amendment by engaging in viewpoint discrimination and is unconstitutionally vague under the Fourteenth Amendment. ISS also alleges that H.B. 1273 runs afoul of the Commerce Clause by attempting to regulate out-of-state

7

companies. Because Plaintiffs are likely to succeed on the merits of their First Amendment claim, the Court begins and ends its analysis there.

### A. H.B. 1273 is Viewpoint Discriminatory

"If there is any fixed star in our constitutional constellation, it is the principle that the government may not interfere with an uninhibited marketplace of ideas." *303 Creative LLC v. Elenis*, 600 U.S. 570, 584–85 (2023) (citation modified). H.B. 1273 does just that.

The First Amendment prohibits both content discrimination and viewpoint discrimination. *Brown v. Kemp*, 86 F.4th 745, 780 (7th Cir. 2023). While content discrimination bars speech "about a specific topic," viewpoint discrimination "instead regulates one perspective within a debate about a broader topic." *Id.* At its core, viewpoint discrimination reflects a government's "disapproval of a subset of messages it finds offensive[.]" *Matal v. Tam*, 582 U.S. 218, 221 (2017) (Kennedy, J., concurring in part and concurring in judgment). Viewpoint discrimination, therefore, "is . . . an egregious form of content discrimination." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). A law can engage in viewpoint discrimination on its face or where "the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Id.*; *see Iancu v. Brunetti*, 588 U.S. 388, 394–95 (2019).

Plaintiffs contend that H.B. 1273 is a prime example of viewpoint discrimination. It imposes burdens on Plaintiffs' speech only if Plaintiffs make a recommendation against entity management on a particular shareholder item. If Plaintiffs recommend that an institutional investor votes in line with company management, "[Plaintiffs] may make that recommendation unencumbered." (Docket No. 30 at ECF p. 18). But recommendations opposing what a company's management advocates trigger the statute's "compelled-speech regime," forcing

Plaintiffs either to compose and distribute a written financial analysis, as defined by the law, or disclose to its clients, company management, and the public via its websites that it made a recommendation against management without conducting such analysis. (GL Docket No. 24 at ECF p. 14). Thus, H.B. 1273 singles out a particular viewpoint—that company management is either wrong or not in line with a client's chosen preferences—and burdens that speech while leaving pro-management speech unburdened. On the topic of corporate governance, the statute facially discriminates against a disfavored viewpoint: that Plaintiffs' paying clients should vote against management.

Moreover, one avenue for complying with H.B. 1273 requires Plaintiffs to produce a written financial analysis that in part "concludes what vote or course of action is most likely to positively affect interest holder value," (Docket No. 26-1 at ECF p. 4), something that ISS claims would require it to engage in a "fraught comparative analysis" on issues that its clients "have varied views on" depending on the different policies that its clients may subscribe to, (Docket No. 30 at ECF p. 21). And some issues, like deciding who should serve on the board of directors, are not readily susceptible to a "written financial analysis." In that event, Plaintiffs can only comply with the statute by disclosing that their recommendation was not based on written financial analysis, which Plaintiffs argue "misleadingly suggests such an analysis is possible[.]" (*Id.* at ECF p. 22; *see* GL Docket No. 24 at ECF p. 18). H.B. 1273 forces Plaintiffs into a lose-lose situation. Plaintiffs can issue a "written financial analysis" that they would not otherwise make. Or they can adorn their policy with a scarlet letter, disclosing to their clients, company management, and anyone visiting their website that their recommendations against management are not based on a written financial analysis, which assumes such an analysis would be possible in the first place.

In *Matal v. Tam*, the Supreme Court heard a challenge to federal trademark law that prohibited the "registration of trademarks that may disparage . . . or bring . . . into contemp[t] or disrepute any persons, living or dead." 582 U.S. at 223 (citation modified). Plaintiff wanted to register "The Slants" for his band, "a derogatory term for persons of Asian descent," and the Patent and Trademark Office denied the application. *Id.* The Court, though split on the test to apply, held that the disparagement clause violated the First Amendment because it engaged in viewpoint discrimination. *Id.* at 243, 247, 248–50. It found that the disparagement clause, though it "evenhandedly prohibits disparagement of all groups" and "applies equally to marks that damn Democrats and Republicans, capitalists and socialists, and those arrayed on both sides of every possible issue," still discriminated against the viewpoint of "giving offense." *Id.* at 243 (citation modified). In so holding, the Court noted that "the term 'viewpoint' discrimination" has been interpreted and used in a broad sense, and that "[g]iving offense" was a viewpoint for First Amendment purposes. *Id.* If "giving offense" is a protected viewpoint, then, as Plaintiffs reason, being "against management" is not so broad a viewpoint as to evade First Amendment protection.

*Brown v. Kemp* is also instructive. There, Wisconsin passed a "hunter harassment law" that made it a crime to "interfere intentionally with a hunter by maintaining a visual or physical proximity to the hunter, by approaching or confronting the hunter, or by photographing, videotaping, . . . or otherwise recording the activity of the hunter." 86 F.4th at 752–53 (citation modified). The plaintiffs opposed hunting and occasionally approached, confronted, and videotaped hunters. *Id.* at 753–54. The Seventh Circuit held that the Wisconsin statute violated the First Amendment because it "discriminate[d] between protected expressive activities based on viewpoint." *Id.* at 778. By regulating "one perspective within a debate about a broader topic,"

10

hunting, the law impermissibly targeted speech based on viewpoint. *Id.* at 780–81. Only conduct that took the "particular viewpoint" of disapproval of hunting was subject to penalties. *Id.* at 781–82. Similarly, only speech that takes a particular view of management's proposals— disagreement—triggers H.B. 1273's disclosure requirements. Like the law in *Brown*, H.B. 1273 is "viewpoint discriminatory on its face[.]" *Id.* at 782.

What the text of H.B. 1273 says, the legislative history confirms. H.B. 1273 engages in viewpoint discrimination because the "perspective of the speaker is the rationale for the restriction." *Rosenberger*, 515 U.S. at 829. The sponsor of the bill confirmed that the burdens of H.B. 1273 apply "just if [a proxy advisor is] disagreeing with management," and that Plaintiffs do not need to "show [their] work" if they are "in . . . agreement with management[.]" (Docket No. 26-3 at ECF p. 910). He further opined that company management "would appreciate" the law because it would provide management with insight as to why proxy advisors opposed their proposals. (*Id.* at ECF p. 951). Moreover, record evidence indicates the text of H.B. 1273 closely tracks the text of a model law, which takes issue with proxy advisory firms using "their services to advance an agenda relating to environmental, social, or governance . . . and diversity, equity, or inclusion . . . issues in a way that is deceptive to shareholders." (*Id.* at ECF p. 857). Indeed, the model law has an identical definition of "written financial analysis" and imposes the same sorts of disclosure requirements as H.B. 1273. (*Compare id.* at ECF pp. 858–59, *with* Docket No. 26-1 at ECF pp. 4–7). While "the statutory text alone shows viewpoint discrimination," evidence outside the text makes this Court's reading of the text "a certainty." *Brown*, 86 F.4th at 783 (citation modified).[3]

---

[3] Defendant takes issue with the discussion of the legislative history and points to an Indiana Code section that disavows the use of statements during legislative hearings "as evidence of the legislative intent, purpose, or meaning of an act enacted or resolution adopted by the general assembly." Ind. Code § 2-5-1.1-16. To be clear, the Court's finding that H.B. 1273 engages in viewpoint discrimination does not rest on legislative history. The text controls the

Defendant's arguments against the finding of viewpoint discrimination are unpersuasive. Defendant contends that H.B. 1273 "does not target speech about any particular topic" and does not "regulate speech because of the State's disagreement with the message conveyed." (Docket No. 46 at ECF p. 19). The Court agrees that the law does not engage in *content* discrimination. H.B. 1273 does not prohibit proxy advisors from, say, considering noneconomic factors in its recommendations and therefore does not "single out any topic or subject matter for differential treatment." *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 71 (2022). But H.B. 1273 *does* impermissibly burden one side of the proxy advising equation by imposing requirements only on recommendations opposing management's viewpoint. And while the Indiana General Assembly may not "disagree" with a proxy advisor's recommendation against management, the statute creates a regulatory framework that shows a preference for pro-management recommendations.

Defendant also claims that H.B. 1273 is "facially neutral as to content and viewpoint" because the "substantive message" contained in Plaintiffs' recommendations "is irrelevant to the application of the provisions." (Docket No. 46 at ECF p. 21) (quoting *City of Austin*, 596 U.S. at 71). In other words, Plaintiffs' recommendation to a client subscribed to the Socially Responsible Investment policy that it vote against a management proposal that did not adequately consider diversity, equity, or inclusion would trigger H.B. 1273, just as Plaintiffs' recommendation to a client subscribed to the Catholic Faith-Based policy that it vote against a management-sponsored, pro-DEI proposal triggers H.B. 1273. But Defendant's argument misstates the relevant viewpoint. H.B. 1273 is not problematic because it singles out one side of the debate on a specific issue. It runs afoul of the First Amendment because it places a thumb on the scale in

---

viewpoint discrimination finding. But, as in *Brown*, "where the text itself discriminates, legislative history that expresses an intent to discriminate bolsters the presumption of constitutional infirmity." *Brown*, 86 F.4th at 783 n.8.

favor of management's recommendation on *all issues* by burdening the opposite viewpoint. H.B. 1273 impermissibly burdens the view that management is wrong or that it is in a client's best interest (as identified by the client's chosen plan) to vote against management.[4]

## B. Defendant's Attempts to Save H.B. 1273 Fail

It is generally "all but dispositive to conclude that a law is . . . viewpoint discriminatory." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 571 (2011). Such laws are typically subject to strict scrutiny, *Brown*, 86 F.4th at 783, though the Supreme Court has also suggested that a "finding of viewpoint bias" is enough to "end[] the matter," *Iancu*, 588 U.S. at 399. But Defendant urges this Court to apply a less exacting form of judicial review for two reasons. First, Defendant argues that H.B. 1273 applies to commercial speech, which generally receives less constitutional protection. *See Curtis v. Thompson*, 840 F.2d 1291, 1298 (7th Cir. 1988). Second, because the speech at issue is commercial, Defendant contends that H.B. 1273 operates as a disclosure requirement designed for consumer protection purposes, warranting deferential review under *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626 (1985). This Court need not address the first contention, because even if Defendant is correct about Plaintiffs' speech being "commercial," *Zauderer* is not applicable to this case.

In *Zauderer*, the Supreme Court considered multiple state regulations imposed on commercial speech by attorneys, including "whether a State may seek to prevent potential deception of the public by requiring attorneys to disclose in their advertising certain information regarding fee arrangements." 471 U.S. at 629. Ohio disciplined a lawyer for failing to include in

---

[4] The Court notes that the district court in Kansas has also concluded that a nearly identical law violated ISS and Glass Lewis's First Amendment rights by engaging in viewpoint discrimination. *Institutional Shareholder Services Inc. v. Kobach*, No. 2:26-cv-2254, at Docket No. 48 (D. Kan. June 24, 2026). A district court in Texas preliminarily enjoined a similar law last year. *See Glass, Lewis & Co., LLC v. Paxton*, No. 1:25-cv-1153 (W.D. Tex. Aug. 29, 2025).

his advertisements that clients "might be liable for significant litigation costs . . . if their lawsuits were unsuccessful[.]" *Id.* at 650. Recognizing the "material differences between disclosure requirements and outright prohibitions on speech," the Supreme Court found that the compelled speech was a valid regulation of what was "orthodox in commercial advertising." *Id.* at 650–51. The disclosures called for "purely factual and uncontroversial information about the terms under which . . . services will be available." *Id.* at 651. And because the disclosures helped "dissipate the possibility of consumer confusion or deception," the Court upheld the disclosure requirement because it was "reasonably related to the State's interest in preventing deception of consumers." *Id.* (citation omitted). *Zauderer* thus creates a pathway to a lower tier of scrutiny for its progeny.

Defendant views this case as controlled by *Zauderer*: H.B. 1273 imposes disclosure requirements on Plaintiffs' speech and simply prompts Plaintiffs to "provide somewhat more information than they might otherwise be inclined to present." *Id.* at 650. There are multiple flaws with this argument. First, *Zauderer* dealt only with commercial advertising but has been applied to speech like nutritional labels and other point-of-sale advertisements. *See Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995) (holding that while states may require factual disclosures in advertising under *Zauderer*, speakers generally have the right to "tailor the speech . . . the speaker would rather avoid"); *Nat'l Ass'n of Mfrs. v. S.E.C.*, 800 F.3d 518, 522–23 (D.C. Cir. 2015) (noting that *Zauderer* was "confined . . . emphatically and . . . intentionally" to commercial advertising); *Am. Meat Inst. v. United States Dept. of Ag.*, 760 F.3d 18, 20, 27 (D.C. Cir. 2014) (applying *Zauderer* to country-of-origin labels on meat packaging); *Md. Shall Issue, Inc. v. Anne Arundel Cnty. Md.*, 91 F.4th 238, 242, 249–52 (4th Cir. 2024) (affirming a district court ruling applying *Zauderer* to a county ordinance that required the local department of health to distribute and display literature about gun safety and mental health where

14

guns or ammunition were sold). But Plaintiffs are not engaged in commercial advertising, and the disclosures are not prompted at the point-of-sale; the disclosures at issue here come *after* clients purchase Plaintiffs' advising services. Applying *Zauderer*'s lenient review to this case would require an extension of existing law, something this Court is hesitant to do without guidance from the Supreme Court or Seventh Circuit Court of Appeals.

Second, the motivating principle behind *Zauderer* is not present here. By requiring attorneys to provide information to prospective clients about fees, Ohio's disclosure requirements protected consumers by providing a complete picture of the service they were purchasing. In contrast, it is hard to see how H.B. 1273 protects consumers by requiring Plaintiffs to tell their clients, many of whom sign up for custom policies, that their recommendation is or is not based on a written financial analysis. Because the deferential review of *Zauderer* relied on the need to "dissipate the possibility of consumer confusion or deception," 471 U.S. at 651 (citation omitted), it would be puzzling to apply it to the case at hand, where sophisticated market participants contract with Plaintiffs to provide recommendations pursuant to customized policies. In other words, the disclosure requirement does not "remedy a harm that is 'potentially real, not purely hypothetical[.]'" *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 776 (citation omitted).

And in any event, for *Zauderer*'s less exacting review to apply, the disclosures in H.B. 1273 must be "purely factual and uncontroversial," and not "unjustified or unduly burdensome." *Id.* at 768, 776. They are not. Plaintiffs argue that the disclosures at issue are flawed for the same reason as the disclosures in *Entertainment Software Association v. Blagojevich*, 469 F.3d 641 (7th Cir. 2006). There, Illinois required "video game retailers to place a four square-inch label with the numerals '18' on any 'sexually explicit' video game," place a sign explaining the rating

system in the store, and provide brochures about the rating system. *Id.* at 643. The Seventh Circuit found these disclosures to be compelled speech rather than "purely factual disclosures." *Id.* at 652. The court reached this conclusion by differentiating the case from *National Electrical Manufacturers Association v. Sorrell*. *Id.* at 651–52. In *Sorrell*, the Second Circuit reversed a district court ruling and found that *Zauderer* applied to a law requiring manufacturers to disclose if a product contained mercury. 272 F.3d 104, 107, 114 (2d Cir. 2001). Placing a sticker on items meeting a statutory definition of "sexually explicit" was "far more opinion-based than the question of whether a particular chemical is within any given product," so the Seventh Circuit found that the Illinois law impermissibly compelled speech. *Blagojevich*, 469 F.3d at 652. The Seventh Circuit also noted the Illinois law supplied the definition of "sexually explicit" and that retailers "may have an entirely different definition of this term." *Id.*

If *Sorrell* is on the permissible side of the disclosure spectrum and *Blagojevich* is on the impermissible side, H.B. 1273 sits somewhere between the two extremes. But this Court is convinced that H.B. 1273's disclosures share features with *Blagojevich* that land on the wrong side of the "purely factual" line. *Id.* While identifying "sexually explicit" content may call for more of an opinion-based inquiry than whether Plaintiffs' recommendation contains "written financial analysis," it is still less factual than whether a product contains mercury. This is because Plaintiffs are beholden to the legislature's definition of "written financial analysis," which calls for Plaintiffs in part to determine "what vote or course of action is most likely to positively affect interest holder value[.]" (Docket No. 26-1 at ECF p. 3). But what positively affects interest holder value in the eyes of some shareholders may not positively affect value for others, particularly given the wide range of custom policies that Plaintiffs utilize in creating recommendations. Similar to *Blagojevich*, Plaintiffs "may have an entirely different definition"

16

of a term in H.B. 1273, produce what they consider to be financial analysis, and still be required to disclose that they did not do a "written financial analysis." 469 F.3d at 652.

To illustrate this point, consider the following situation: ISS produces a recommendation about a new drilling venture proposed by Exxon Mobil. The recommendation looks at the short-term and long-term financial benefits and costs of the proposal, considers factors pertinent to its Climate policy, and recommends the client vote against the drilling venture. But because ISS did not "conclude[] what vote or course of action is most likely to positively affect interest holder value," in this hypothetical, H.B. 1273 would still require ISS to disclose to its clients, to management, and to the public that it did not undertake a "written financial analysis." (Docket No. 26-1 at ECF pp. 4, 6–7). ISS would have certainly included financial analysis in its recommendation, just not Defendant's preferred definition of that term. H.B. 1273 therefore mandates disclosures that could themselves be confusing or deceptive, achieving the opposite goal of *Zauderer*, 471 U.S. at 651, and that at any rate are not "purely factual," *Blagojevich*, 469 F.3d at 652.

As to the "unduly burdensome" part of *Zauderer*, ISS "anticipates providing upwards of 22,500 proxy research reports addressing upwards of 160,000 ballot items" to its clients in Indiana or about Indiana companies by the end of the year, and claims that it does not possess the ability to "track and send warnings on thousands of recommendations" that may trigger the statute. (Docket No. 50 at ECF p. 16). Complying with H.B. 1273 imposes heavy burdens and further convinces this Court that deferential review under *Zauderer* is not warranted.

### C. H.B. 1273 Does Not Pass Intermediate Scrutiny

Having found that H.B. 1273 engages in viewpoint discrimination, that *Zauderer* does not apply, and assuming that the speech at hand is commercial, the Court is left only to determine the

17

appropriate level of scrutiny. In *Matal*, a four-justice plurality of the Supreme Court, rather than "resolve th[e] debate" about the proper test to apply to a statute that may have regulated commercial speech but engaged in viewpoint discrimination, applied intermediate scrutiny because the challenged law could not withstand that lower standard. 582 U.S. at 245; *see also Richwine v. Matuszak*, 148 F.4th 942, 954 (7th Cir. 2025) (applying intermediate scrutiny to a law that discriminated based on content and noting that "declining to decide the appropriate level of scrutiny when a statute would fail even under a lower level of scrutiny" is an acceptable path). Applying that same logic, this Court finds that H.B. 1273 does not pass intermediate scrutiny.

To withstand intermediate scrutiny, a commercial speech restriction must advance a "substantial" government interest, the restriction must "directly advance[] the governmental interest asserted," and cannot be "more extensive than is necessary to serve" the government interest. *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 566 (1980). The fit between H.B. 1273's "means and its ends" must be "reasonably close . . . though perfect calibration is not required." *Nicodemus v. City of South Bend*, 137 F.4th 654, 668 (7th Cir. 2025) (citation modified).

Defendant claims that H.B. 1273 advances numerous state interests, "including preventing deception, keeping consumers and retail investors informed about proxy advisors' services, and promoting the free flow of commercial information." (Docket No. 46 at ECF p. 30). Courts routinely recognize that "consumer protection is a legitimate state interest." *Minerva Dairy, Inc. v. Harsdorf*, 905 F.3d 1047, 1053 (7th Cir. 2018). Defendant has thus advanced a substantial government interest behind H.B. 1273.

But while consumer protection may be commendable, it is difficult to see how H.B. 1273 "directly advances" that interest by requiring Plaintiffs to produce either a "written financial

18

analysis" or to disclose to their clients that they did not do such an analysis any time they disagree with management. *Cent. Hudson*, 447 U.S. at 566. Plaintiffs' clients choose the policy that they wish to apply to a given shareholder vote, with most clients opting for custom policies. Plaintiffs' clients are not bound by Plaintiffs' recommendations and are free to vote contrary to them. Defendant argues that H.B. 1273's anti-management disclosure requirements "reflect a legislative determination of where the risk of harm is greatest." (Docket No. 46 at ECF p. 30). But what harm is there in institutional investors receiving recommendations to vote against management, for which they pay significant prices, (*see* Docket No. 26-2 at ECF p. 5), based on criteria that they selected? Moreover, Defendant identifies no evidence showing that Plaintiffs' clients have been confused or deceived by one of Plaintiffs' recommendations. This helps "illustrate the poor fit between the statute's means and its ends." *Richwine*, 148 F.4th at 957; *see also Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 664 (1994) (a government's asserted interest must "do more than simply posit the existence of the disease sought to be cured.") (citation modified).

To be sure, Defendant claims that H.B. 1273 "reflects legitimate concerns" that proxy advisors "were being misleading in describing their services as maximizing shareholder value" when "substantial evidence" shows that Plaintiffs' recommendations actually "deplete shareholder value." (Docket No. 46 at ECF pp. 24–25) (citation modified). To support that assertion, Defendant cites an article describing a survey of retail investors making the same claim. (Docket No. 45-7 at ECF pp. 2, 4). But the impact of proxy advisors on shareholder value is not a settled topic, and ISS points to a publication with the opposite view. (Docket No. 26-3 at ECF pp. 747–49). If anything, Defendant's reliance on this concern is further proof that H.B.

1273's disclosure regime, rather than advance the state's interest in consumer protection, reflects Defendant's disfavor for Plaintiffs' recommendations that oppose management.

Defendant's interest in "keeping consumers and retail investors informed about proxy advisors' services," suffers from the same problem. (Docket No. 46 at ECF p. 30). At oral argument, Defendant explained this interest by positing that retail investors may see the disclosure on a proxy advisor's website and lobby the institutional investor serving as their proxy to do additional analysis or change proxy advisory firms. (*See* Docket No. 52 at ECF pp. 75–77). But that is too attenuated a connection to "directly advance" the state's interest. *Cent. Hudson*, 447 U.S. at 566. The law imposes significant burdens on Plaintiffs' anti-management recommendations in the hope that a consumer, somewhere down the line, *might* ask for additional analysis. While this may protect consumers in theory, it is far from "directly advancing" the state's consumer protection interest in practice. *Id.* And as to Defendant's interest in advancing the free flow of information, Defendant does not distinguish how that interest is advanced separately from its consumer protection argument.

At bottom, H.B. 1273 cannot withstand intermediate scrutiny because the statute does not "directly advance[] the governmental interest asserted." *Id.* Plaintiffs are therefore likely to succeed on the merits of their First Amendment claim.

### D. The Remaining PI Factors Favor Plaintiffs

In First Amendment cases, "the likelihood of success on the merits will often be the determinative factor," *Joelner v. Vill. of Washington Park, Ill.*, 378 F.3d 613, 620 (7th Cir. 2004), because losing First Amendment freedoms "unquestionably constitutes irreparable injury," *Alvarez*, 679 F.3d at 589, that is difficult to remedy by monetary damages, *Flower Cab Co. v. Petitte*, 685 F.2d 192, 195 (7th Cir. 1982). And where plaintiffs demonstrate a likelihood of

success on the merits "the public interest is not harmed by preliminarily enjoining the enforcement of a statute that is probably unconstitutional." *Alvarez*, 679 F.3d at 590. Because Plaintiffs established their likelihood of success on the merits, that they would likely suffer irreparable harm absent the injunction, that the balance of equities tips in their favor, and that such an injunction is in the public interest, *Pritzker*, 973 F.3d at 762, Plaintiffs are entitled to the preliminary injunction they seek.

One final note: Defendant asks the Court to "sever" the portions of H.B. 1273 that are likely to be unconstitutional from the remainder of the statute that is unchallenged. (Docket No. 46 at ECF pp. 36–37). But "[u]ntil there is a final determination regarding the constitutionality of all the challenged provisions, the question of severability is premature." *Harp Advert. of Ill. v. Vill. of Chicago Ridge*, No. 90 C 867, 1992 WL 386481, at \*12 (N.D. Ill. Mar. 13, 1992). Resolving the severability question is a task that "belongs to the merits phase, when the court considers final relief." *Space Expl. Techs. Corp. v. NLRB*, 151 F.4th 761, 773 (5th Cir. 2025).

## IV.    Conclusion

For the reasons stated herein, Plaintiffs' Motions for Preliminary Injunction, (Docket No. 26; GL Docket No. 23), are **GRANTED**. The Court will issue an injunction by separate order only as H.B. 1273 applies to ISS and Glass, Lewis & Co., LLC. The Court will consolidate these two cases by separate entry.

**IT IS SO ORDERED.**

Dated:  June 26, 2026

Matthew P. Brookman, Judge
United States District Court
Southern District of Indiana

21

Served electronically on all ECF-registered counsel of record.